[Civ. No. 5266. Fifth Dist. May 12, 1981.]

MONTEBELLO ROSE COMPANY, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

**COUNSEL**

Thomas, Snell, Jamison, Russell, Williamson & Asperger, John E. Peterson, Howard A. Sagaser and Jay V. Jory for Petitioner.

Littler, Mendelson, Fastiff & Tichy, George J. Tichy II and John M. Skonberg as Amici Curiae on behalf of Petitioner.

Ellen Lake, Manuel M. Medeiros, Daniel G. Stone, Suzanne Vaupel, Nancy C. Smith and Octavio Aguilar for Respondent.

Dianna Lyons, Marco E. Lopez, Carlos M. Alcala, Francis E. Fernandez, Carmen S. Flores, Federico G. Chavez, Ellen J. Eggers and Daniel A. Garcia for Real Party in Interest.

**OPINION**

**FRANSON, J.—**

### INTRODUCTION

This review presents four questions arising in the context of collective bargaining under the Agricultural Labor Relations Act: (1) whether the doctrine of res judicata bars relitigation of the good faith bargaining issue in an unfair labor practice proceeding after the Agricultural Labor Relations Board has denied an extension of the initial certification under Labor Code section 1155.2, subdivision (b);[1] (2) whether an employer's duty to bargain with the certified employee representative continues beyond the initial certification year absent an extension of the certification period as provided in section 1155.2, subdivision (b); (3)

---

[1] Labor Code section 1155.2, subdivision (b) reads as follows: "Upon the filing by any person of a petition not earlier than the 90th day nor later than the 60th day preceding the expiration of the 12-month period following initial certification, the board shall determine whether an employer has bargained in good faith with the currently certified labor organization. If the board finds that the employer has not bargained in good faith, it may extend the certification for up to one additional year, effective immediately upon the expiration of the previous 12-month period following initial certification."

Subsequent code references are to the Labor Code unless indicated otherwise. Agricultural Labor Relations Act will be referred to as ALRA or Act.

whether the six-month limitation period for issuing an unfair labor practice complaint set forth in section 1160.2 is tolled in a surface bargaining case until such time as the charging party discovers, or in the exercise of reasonable diligence should have discovered, the other party's bad faith in bargaining; and (4) whether written communications between an employer and his attorney-negotiator concerning pending collective bargaining negotiations are within the attorney-client privilege or any other recognized privilege.

We answer the first and fourth questions in the negative and the second and third questions in the affirmative. Other contentions of the employer are treated seriatim.

STATEMENT OF THE CASE

The order of the Agricultural Labor Relations Board (Board) is based on findings that petitioner Montebello Rose Company, Inc. (Montebello) engaged in unfair labor practices in violation of section 1153, subdivisions (a), (c) and (e),[2] by discriminatorily firing certain employees because of union activity and by failing to bargain in good faith with real party in interest United Farm Workers of America, AFL-CIO (UFW or the union).

The procedural history of this protracted and complex case is as follows:

The UFW was certified as the collective bargaining representative for Montebello's employees on December 3, 1975. After some three-month delay, several negotiating sessions were held in the first half of the certification year; however, negotiations came to a standstill in June 1976, when Montebello declared that an impasse had been reached. No further negotiations took place during the certification year.

---

[2]Section 1153 provides in pertinent part: "It shall be an unfair labor practice for an agricultural employer to do any of the following:

"(a) To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152.

". . . . . . . . . . . . . .

"(c) By discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization.

". . . . . . . . . . . . . .

"(e) To refuse to bargain collectively in good faith with labor organizations certified pursuant to the provisions of Chapter 5 (commencing with Section 1156) of this part."

On October 4, 1976, as the initial certification year was drawing to a close, the union filed a petition with the Board seeking extension of the union's certification pursuant to section 1155.2, subdivision (b). This section allows the Board to extend certification if it finds the employer has failed to bargain in good faith. On November 10, 1976, the Board denied the UFW's petition, finding that the union had failed to show bad faith in the bargaining process on Montebello's part.

After the UFW's certification year expired on December 3, 1976, the union continued to press for negotiations with Montebello. Montebello, however, took the position that it had no duty to bargain with the UFW after its certification year ended.[3] On February 4, 1977, Montebello filed an action for declaratory relief in the Kern County Superior Court, seeking a determination whether it was obligated to bargain after the certification year expired.[4]

While the declaratory relief action was pending, the general counsel filed a complaint against Montebello alleging that Montebello had committed an unfair labor practice by refusing to bargain with the UFW since about February 3, 1977. The complaint originally alleged only the refusal to bargain *after* the certification year had ended; however, the complaint was later amended to allege Montebello's refusal to bargain in good faith during the certification year. The complaint also alleged that Montebello committed unfair labor practices by terminating the employment of six named employees because of their support of the UFW.

A 21-day hearing was conducted before an administrative law officer (ALO) between June and September 1977.[5] The ALO found that Mon-

---

[3]This issue has not yet been decided by a published Court of Appeal decision, although the Board has issued an advisory opinion stating that the employer's duty to negotiate in good faith does not lapse at the end of the certification year (*Kaplan's Fruit & Produce Co., Inc.* (1977) 3 A.L.R.B. No. 28—hereinafter referred to as *Kaplan's*).

[4]The outcome of this litigation was that no declaratory judgment was granted. The superior court sustained the UFW's demurrer to Montebello's complaint, after it was directed to do so by this court on July 29, 1977 (*United Farm Workers* v. *Superior Court* (1977) 72 Cal.App.3d 268 [140 Cal.Rptr. 87]). The basis for this court's decision was that the trial court lacked jurisdiction to entertain the declaratory relief action because the ALRA vested exclusive primary jurisdiction in the Board over all phases of administration of the Act with regard to unfair labor practices (*id.*, at pp. 271, 276-277).

[5]The hearing on the Montebello charges was consolidated with a hearing on similar charges against Mount Arbor Nurseries, Inc. Mount Arbor is not a party to this re-

tebello had refused to bargain in good faith with the union in violation of section 1153, subdivision (e); that Montebello had maintained a pretense of negotiation with a view toward avoiding a strike during the crucial budding season when the employees were needed to perform work on Montebello's rosebushes.

The following conduct by Montebello formed the basis for the ALO's decision: (1) insisting on provisions predictably unacceptable to the UFW; (2) bargaining in bad faith on several matters including a provision for collection of union dues and a provision for contributions to a specific medical plan; (3) refusing to focus on reasons for some of Montebello's positions and giving pretextual reasons for opposition to certain UFW proposals; (4) failing to make positive efforts to find common grounds for agreement in areas of conflict; (5) contriving an artificial impasse on June 10, 1976, and refusing to bargain with the UFW thereafter unless the union would accept responsibility for the impasse; and (6) refusing to bargain with the UFW after expiration of the certification year.

The ALO also relied on Montebello's conduct away from the bargaining table as evidence of its bad faith, including Montebello's attempt to bargain directly with its employees in derogation of the union as the employees' exclusive bargaining agent.

The ALO also concluded that Montebello had violated section 1153, subdivisions (c) and (a) by discriminatorily discharging two employees and laying off four others because of their union involvement. The ALO rejected as pretextual Montebello's asserted business justifications for these actions.

By way of remedy, the ALO recommended reinstatement and back pay for the employees discharged and also recommended that a make-whole remedy be imposed for the failure to bargain in good faith. The ALO recommended that the period covered by the make-whole remedy should commence April 22, 1976; this was based on his conclusion that the six-month limitations period in section 1160.2 precluded any relief for bad faith refusal to bargain prior to that date because no charge had been filed alleging such bad faith until October 22, 1976.

---

view; however, certain conduct by Mount Arbor is relevant to this case because Montebello joined forces with Mount Arbor in negotiating with the union.

The Board affirmed the findings and conclusions of the ALO with respect to the discriminatory discharges and the refusal to bargain in good faith.

As a remedy, the Board adopted the ALO's proposed order with the modification that the make-whole remedy should be imposed for the period commencing February 4, 1976, rather than April 22, 1976. The Board concluded that notwithstanding the statute of limitations in section 1160.2, the remedy should be imposed from the earlier date in February, which it determined in hindsight to be Montebello's first manifestation of bad faith. The Board reasoned that the six-month limitations period in section 1160.2 was not a bar to such relief because the statute had been tolled during the period Montebello engaged in surface bargaining since the union had no actual or constructive notice of Montebello's bad faith until the artificial impasse was declared on June 10, 1976.

The Board's order also required other remedial actions by Montebello including that it meet and negotiate with the union on demand. The Board also extended the union's certification for one year from the date of the order.

### STATEMENT OF THE FACTS[6]

Montebello Rose Company is a family owned corporation which grows rosebushes in McFarland, California. At relevant times, Fred Mungia was Montebello's president and Richard Barwick its general manager. In years past, Montebello has employed in excess of 100 employees during the peak harvest season. Fewer employees are needed in other seasons; however, during the period from late April to early June, there is a particular need for employees to perform the crucial "budding" or grafting work on the rosebushes.

On November 17, 1975, the UFW received a strong majority (95 out of 111) of the ballots cast at a representation election among Montebello's employees. On December 3, 1975, the union was certified as the exclusive bargaining representative for Montebello's employees. Three days later the president of the UFW wrote to Montebello asking for a

---

[6]This statement does not purport to be an exhaustive summary of the evidence. With respect to the negotiation process, we relate only enough to show there is sufficient evidence to uphold the Board's findings of fact.

preliminary negotiating meeting and requesting Montebello to send certain information the union wanted to use in preparing proposals. The UFW's negotiator, Sylvan Schnaittacher followed up this letter with phone calls to Montebello, but Schnaittacher had difficulty reaching anyone who would accept responsibility for negotiations. Eventually, Schnaittacher learned that William Callan was to handle the negotiations for Montebello.

After several unsuccessful attempts by Schnaittacher to set up a meeting with Montebello representatives and after Cesar Chavez sent a letter to Montebello's president threatening legal action if no meeting was arranged, Montebello representatives met with the union for the first session on January 21, 1976—about six weeks after the UFW's first request for a meeting. Callan represented Montebello and Schnaittacher was spokesman for the union at this meeting. The UFW submitted its first proposal which was reviewed at the January 21st meeting. A second meeting was held on February 4th, at which time there was further discussion of the union's proposal. At the end of this session, it was agreed that it was up to Montebello to make a counterproposal, according to Schnaittacher's testimony.

After the second meeting, Schnaittacher never heard from Callan again although Schnaittacher made several unsuccessful attempts in February and March to reach Callan by phone to arrange for further negotiations. No further sessions took place for about three months and no counterproposal was submitted by Montebello to the union during those months.

Sometime around April 1976, Montebello arranged for Attorney Jay Jory to take Callan's place as negotiator. Jory had been negotiating on behalf of Mount Arbor Nursery Co. for a contract with the union and Montebello decided to join the Mount Arbor negotiations which had progressed further. On April 21st, Mr. Jory wrote to Richard Chavez of the UFW, informing him that Montebello was joining the Mount Arbor negotiations and that Montebello wanted to adopt an agreement reached between Mount Arbor and the union whereby the union would ensure that the employees who performed "budding" work would not strike, in return for the companies' promises to pay any wage increases resulting from a collective bargaining agreement retroactively to April 15, 1976. Montebello's act of joining the Mount Arbor negotiations and adopting the no-strike agreement coincided approximately with the commencement of the crucial season in late April, when Montebello

needed to have its budding work performed. The ALO found that Montebello's objective was to get through the budding season without a strike, while giving the appearance of good faith bargaining.

A series of joint negotiating sessions between the two companies and the union commenced on May 13, 1976. At this meeting Dolores Huerta took over as the negotiator for the UFW; Jory now represented Montebello as well as Mount Arbor. When the joint negotiations commenced, there was a counterproposal from Mount Arbor "on the table" and there had already been tentative agreements at previous meetings between Mount Arbor and the union as to some of the proposed articles.

Huerta submitted modified proposals on articles involving hiring, seniority, and grievance procedure, and Jory expressed concern that the parties seemed to be moving farther apart on areas where agreement had been reached with the previous union negotiator Schnaittacher. In Huerta's testimony before the ALO, she defended the union's modifications in these articles on the ground that changes were still permissible because only parts of the articles had previously been agreed to. Huerta testified that it is a common negotiating procedure to consider that an article is not settled until all its parts have been agreed to because the various paragraphs of an article are frequently interrelated.

There was also a heated discussion at this first joint session about union security provisions the UFW wanted: a dues checkoff clause and a provision for dismissal of employees not in "good standing" with the union. Jory stated that the companies opposed the dues checkoff provision because it would generate extra paper work and require additional employees. The stated reason for opposition to the "good standing" clause was that such a provision was illegal under the NLRA and the companies wanted to give their employees the same protections they would receive under that law, which concededly did not apply to farmworkers. The ALO found that the reasons asserted by Jory for opposition to the dues checkoff and good standing clauses were pretextual and the Board affirmed this finding.

At the first joint negotiating session, the companies and the union also stated their positions with respect to other key articles and by the afternoon session, Jory stated that the tone of negotiations had improved.

Following the May 13th meeting, there were four additional joint negotiating sessions—on May 26, May 27, June 9 and June 10. The Board found that the parties made substantial progress at these meetings toward resolving their differences in key areas such as hiring and seniority. Additionally there was agreement on a significant number of other articles. Disagreement remained on certain provisions, particularly the article concerning union security. The companies maintained their staunch opposition to the union's proposals on the issues of dues checkoff and discharging employees for loss of good standing in the union. The union remained insistent that these provisions were necessary.

The parties also failed to reach an agreement on economic issues. The possibility of an agreement on wages was never fully explored because negotiations ended abruptly on June 10, 1976. Although the parties had chosen a target date of June 24th for an agreement and had scheduled four meetings between the 15th and 23d of June, these last four meetings never took place.

The circumstances surrounding the breakdown in negotiations were as follows. On the morning of June 10th, the parties again discussed the issues of seniority, hiring and grievance procedure. Their differences seemed to have narrowed somewhat on these issues. Jory stated at one point that he didn't think the parties were too far apart on seniority. However, toward the lunch hour a disagreement developed as to which classifications of workers would be included on which seniority list. Dolores Huerta suggested just before the lunch break that the parties have a typewriter handy when they returned so that each point could be typed up and initialled when agreed to. The companies returned from the lunch break with a complete proposal. After Jory outlined the proposal to Huerta, the following dialogue occurred: "[Jory]: ... The Company has spent a good deal of time and money to reach an agreement. We've tried to reach a compromise, and we feel at this point further discussions are futile. We've now given what we're willing to give you if you want an agreement; we urge you to take it to your workers to vote on it. I'll confirm our proposal in writing and hopefully get it in the mail tomorrow. We'll give you one week to give us a decision.

"[Huerta]: One week on what?

"[Jory]: If you refuse our proposal, you'd better be prepared that we'll unilaterally be prepared to implement certain specific aspects...

"[Huerta]: Just a minute. You owe us a bit of courtesy. What do you mean?

"[Jory]: What I just told you is that we're at impasse. We're at the final proposal for settlement. If you want a contract, please accept it. The law says that when we have given you our firm, final offer after extensive negotiations, we're free to implement specific aspects that we have offered and you have rejected. We're not saying we're going to implement ... we'll give you a week.

"[Huerta]: I'll tell you now we don't accept your proposal.

"[Jory]: Negotiations are at a close."

As noted previously, the ALO and the Board concluded that the impasse was contrived, because the parties still had room for movement on key issues, including wages which had never been fully discussed. The final offer from Montebello proposed $3.05 per hour for basic help. The UFW asserts that this was so close to its proposed basic wage that an agreement could have been reached, if the final offer had not been on a "take it or leave it" basis. The Board concluded that the employers' "premature declaration of impasse aborted the negotiating process long before the possibilities for movement and agreement on economic issues were adequately explored."[7]

During the period following the June 10th breakdown in negotiations, letters were exchanged between Montebello's negotiator and union spokespeople. Jory's letters called upon the union for a "constructive response" to the companies' last proposal and suggested that negotiations could resume if the union demonstrated "that the impression it [the union] has created that the negotiations are at impasse is not the case." Jory also suggested that a representative from the state conciliation service might be brought in to assist. The union's response to these letters was that it would not accept a proposal delivered on a "take it or leave

_____

[7]A memorandum written by Jay Jory to Montebello's general manager on June 2d indicates the companies' negotiator recognized that there was still room for movement on economic issues at that point. This memo stated in part: "During this week, it is important that we consider the various areas remaining for Company movement in the negotiations. Of particular importance will be the remaining economic movement available to the Companies. Consideration should be given to the possibility of making further economic movement next week, especially in the area of an intermediate increase in the base pay as well as possible increases in the tractor driver and irrigator rates."

it" basis and would resume negotiations only after the companies withdrew the ultimatum delivered on June 10, 1976.[8]

The standoff continued throughout the rest of the certification year. In October 1976, the UFW filed its petition for extension of certification which was denied by the Board in early November 1976. Several days later, Jory wrote to Montebello's general manager, Richard Barwick, enclosing a copy of the Board's order denying an extension of certification. Jory's letter suggested that Barwick communicate directly with the employees and urge them to give the company a chance since the union failed to fulfill its promises.[9] Barwick wrote back promptly to Jory, informing him that he had begun the campaign to win the workers away from the union. Barwick's letter stated that he had assembled his crew on November 16, 1976, and informed them that there could be another election because the union's certification had not been extended. Barwick's letter stated that he urged the workers to consider a proposal from Montebello's president Fred Mungia before voting. Barwick told the workers that the proposal would be ". . . the best that Fred would do with or without the Union." He also told the workers that ". . . Fred want[ed] to give the people what they want without the Union."

In the latter part of November or early December 1976, Montebello's president and its general manager decided to unilaterally raise wages to a level where basic workers would receive $3.30 per hour. The decision was made not to implement the wage hike until Barwick and Mungia

---

[8]The following quote from a letter sent by the union to Jory indicates the union's position after the June 10th breakdown in negotiations:

"May we inform you that our Union will not accept a proposal from any Company when presented as an ultimatum on a take it or leave it basis. Our notes of the June 10, 1976, negotiations session show that you gave the Union a week to respond, if we wanted an agreement based on your proposal, and that any further discussion was futile. May we again repeat, your action, on behalf of the Companies you represent, is certainly a violation of the ALRA good faith bargaining.

"The Union cannot meet under the impression that you are trying to convey—that we created the impasse in negotiations. The Union will consider further negotiations when you unequivocally state in writing that your position, as stated on June 10, 1976, to our negotiator and negotiating committee, has been withdrawn."

[9]The following is an excerpt from Jory's letter to Barwick: ". . . [I]t seems that the momentum in the entire matter of unionization of your employees is now going the Company's way. As we discussed, consideration should be given in the near future to preparing communications to the employees which, while making no promises, urge them now to give the Company a chance in view of the fact that the Union fulfilled few, if any, of its promises in a year's time." Montebello contends that this letter was inadmissible under the attorney-client privilege.

"were sure certification had run out." Two days after the union's certification lapsed, the wage increase went into effect. Barwick acknowledged at the hearing before the ALO that he knew, when the wages were raised to $3.30 per hour for basic help, that this was higher than Montebello's best offer to the union ($3.05 per hour for basic help). Barwick also acknowledged that in April 1976 (over a month before the company's "final" offer of $3.05 per hour for basic help) he wrote to Jory suggesting that Montebello would go as high as $3.30 per hour for basic help.

On February 3, 1977, about two months after the certification year had lapsed, the union again requested resumption of negotiations. Montebello maintained that it had no duty to bargain once the certification year ended. It was stipulated by Montebello that it refused to bargain after February 3, 1977. Almost immediately after the union requested the resumption of negotiations in February 1977, Montebello filed the superior court action for declaratory relief (see fn. 4, *ante*).

In April 1977, the ALRB decided in *Kaplan's* (3 A.L.R.B. No. 28) that the duty to bargain does not end after the certification year lapses. The union wrote to Montebello in April advising Montebello of the *Kaplan's* decision and requesting that negotiations resume. In mid-April (as budding season was again approaching) Montebello's general manager, Barwick, spoke with Richard Chavez of the union about resumption of negotiations. Barwick asked if there could be some sort of guarantee that the workers would not strike until bargaining was resumed. Chavez answered emphatically in the negative because a "no-strike" guarantee had been given the previous year, and then Montebello had bargained in bad faith, according to Chavez. When the union refused to guarantee that there would be no strike, Barwick abandoned efforts to set up any negotiations.

Montebello did make one more offer to resume negotiations near the beginning of August 1977. At that point, the hearings before the ALO on the instant charges had been under way for several weeks. Montebello offered to negotiate further if the unfair labor practice proceedings were stopped. The offer was refused.

Montebello's general manager, Barwick, testified that the company at all times, even up to the hearing, was willing to sign a contract with the union.

### FACTS RELATING TO THE DISCHARGE
### OF ARMENDARIZ AND ESCALANTE

Pedro (Pete) Armendariz and Richard Escalante were fired by Montebello on November 29, 1975, shortly after the UFW won the representation election. During the period before the election Pete Armendariz had assisted UFW organizers; he also wore a UFW button on the outside of his work jacket every day.

Pete gave the following testimony concerning the circumstances surrounding his termination by Montebello. On November 29, 1975, Pete and Richard were working in a crew which was assigned to cut budwood. The crew performed several cutting assignments in the morning, and sometime in the early afternoon (between about 1:30 and 3 p.m.) Pete and Richard finished their share of the crew's third assignment. They wanted to leave then so they got permission to do so from their crew leader Ruben Torrez. Ruben told Pete and Richard they could leave because the rest of the crew was almost finished with its share of the third assignment.[10]

Pete and Richard left in Pete's car, which had a bumper sticker bearing the UFW emblem. They went to Richard's house, which was right across from the Montebello offices. While Pete was standing in front of Richard's house, he saw Montebello's general manager, Barwick, drive by. Pete noticed that Barwick stared at him. After 10 or 15 minutes, Pete and Richard went out to buy some beer. When they passed the Montebello offices in Pete's car, they saw Barwick sitting in his truck which was parked with its front aimed towards the street. After Pete and Richard drove by the office, Pete noticed that Barwick was driving behind them.

Pete and Richard went into a store to buy beer. While they were there, Barwick entered the store. Barwick bought a cigar and left without speaking with the two workers. Pete and Richard returned to Richard's house and about 10 to 15 minutes later, two other workers from their crew came by. The others told Pete and Richard that Pete's father, Diego, a foreman, had told them that Barwick had fired Pete and Richard.

---

[10]The evidence showed that each crew was paid on the basis of how much budwood it had cut. Each crew was collectively responsible for an assignment and each member was credited with and paid for having cut the same amount as other crew members. Normally all the members of a particular crew left at the same time, but on the day in question, Torrez let Pete and Richard leave ahead of the other crew members because Pete and Richard finished their share of the assignment early.

Pete and Richard went back to find out what happened. Barwick told them he fired them because "when people are sick, they do not drink beer." The workers asked who was sick and Barwick answered: "you guys, aren't you?" Pete and Richard answered "No." Pete explained to Barwick that he and Richard had left because they were finished with their work, which was paid by "piece rate." Barwick answered that he didn't care even if the pay was by piece rate and that he expected a full day's work from his employees. Pete then found his father Diego and asked him why Barwick had fired the two. Diego said he didn't know.

There was testimony from Pete and Richard's crew leader, Ruben Torrez, indicating that Pete and Richard did nothing unusual by leaving work in the early afternoon on the day in question. Ruben testified that the rest of his crew left just 15-20 minutes after Pete and Richard yet they were not criticized. Although some crews worked later, it was customary for cutting crews to leave anywhere between 2 and 3 p.m. if they were tired. The number of assignments completed by Pete and Richard's crew on the day in question was within the customary range. The evidence showed that some other crews accomplished less on the day in question.

Barwick testified that the reason he discharged Pete and Richard was he had been told by Pete's father Diego, that Pete and Richard left work early because they were sick, yet Barwick saw them drinking beer during normal working hours. The ALO concluded that Barwick's asserted reason for discharging the workers was pretextual and that Barwick's antiunion animus was a factor in the terminations. He concluded that Pete was fired for his activities in support of the union and that Richard was fired because he was so closely associated with Pete that the discrimination would have been obvious had the two not been treated similarly. The Board affirmed the ALO's conclusions with respect to the discharge of these employees.

FACTS RELATING TO THE LAYOFFS OF FOUR
UNION NEGOTIATING COMMITTEE MEMBERS

On June 4, 1976 (about a week before the breakdown in negotiations on June 10th) Montebello's employees were called together so that the general manager Barwick, could speak with them. It was announced that Domingo Avina, Uvaldo Ramirez, Jose Rubio and Ruben Torrez were to be laid off because of a work cutback; about 20 employees were laid off at that time.

Avina, Ramirez, Rubio and Torrez were all members of the union's negotiating committee; Barwick had seen them all at the negotiating sessions. Each of the four had been a steady, year round employee and each had survived previous cutbacks more severe than the one in question without being laid off. Avina began working for Montebello in 1968 and worked there almost continually except for one brief period away from the company. Torrez started working for Montebello in 1968 and continued to work there until 1976, except for a period in 1969. Rubio began working for Montebello in 1974 and he had done irrigating work for Montebello starting in 1975. Ramirez first applied for work at Montebello in 1972; he was a permanent worker in 1975 and 1976.

The ALO concluded that a discriminatory motive for the layoffs of Torrez, Rubio, Avina and Ramirez was established by the evidence that "the four were among the most active members of the negotiating committee, had not previously been laid-off at that time of year and had seniority beyond those retained."

Montebello introduced evidence to show that the layoffs were for valid business reasons. Mr. Barwick testified that in the spring of 1976, the company reduced its labor force and the acreage it cultivated in response to the declining demand for roses. Barwick asserted that the decision as to which employees would be laid off was made based on the two criteria of seniority and special skills. He acknowledged, however, that at least four employees who were retained had less seniority than Ruben Torrez, who was laid off. Barwick admitted that Armando Hernandez was retained although he had less seniority, but he defended this decision on the ground that Hernandez was a better irrigator than Jose Rubio who was laid off. Yet there was evidence that Rubio had extensive irrigating experience and Rubio testified that his work had been praised by his supervisors. Montebello also asserted that it retained Hipolito Cervantes, although he had less seniority than Ruben Torrez who was laid off, because of the former's tractor driving skills. Yet the evidence showed that Torrez was an experienced tractor driver.

The ALO found based on the foregoing evidence that neither seniority nor special skills were the criteria which guided Montebello in determining who should be laid off in June 1976. The ALO's opinion expressly stated that Montebello's asserted reasons for the layoffs of the four negotiating committee members lacked credibility. The ALO

found that the impetus for the layoffs of these four was antiunion animus.

The evidence showed that two of the committee members (Ramirez and Avina) were rehired approximately two weeks later when Montebello began increasing its work force again. However, the ALO concluded that this did not negate a finding of antiunion animus, but instead confirmed that the layoff decisions were not based on a sound appraisal of business needs. Rubio and Torrez were not rehired during subsequent periods when the company again began increasing its labor force.

### Substantial Evidence Supports the Board's Findings That Montebello Violated the Duty to Bargain During the Initial Certification Year and Discriminatorily Discharged Six Employees

We need pause but a moment to answer Montebello's argument about the insufficiency of the evidence to support the Board's findings of fact. Suffice it to say, we have carefully examined all of the evidence, both in favor of and opposed to the Board's decision as required by *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 487-490 [95 L.Ed. 456, 467-469, 71 S.Ct. 456]. We find ample support for the findings that Montebello discriminatorily fired the six employees for union activity and that it "intended to bargain with the union only to the extent necessary to get through the budding season and ultimately the initial certification year without reaching agreement with the union."

Credibility resolutions of witnesses are particularly for the trier of fact; such decisions are not reviewable by the court unless the testimony is incredible or inherently improbable, which is not the case here. (*Perry Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1978) 86 Cal. App.3d 448, 463-464 [150 Cal.Rptr. 495].)

Regardless of the general counsel's burden of proof before the Board,[11] the Board's findings are binding on this court if

---

[11]The general counsel has the burden of proving the unfair labor practice charge by a preponderance of the evidence (§ 1160.3). In a discriminatory firing case, when the general counsel proves a prima facie case of employee firing because of union activity, the employer bears only the burden of clearly explaining the nondiscriminatory reasons

supported by substantial evidence on the record considered as a whole. (§ 1160.8; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335 [156 Cal.Rptr. 1, 595 P.2d 579].)

Montebello's wearisome 84-page argument about the facts reminds us of the oft quoted statement in civil appeals: "Andre Gide once observed: 'Everything has been said already; but as no one listens, we must always begin again.' With rhythmic regularity it is necessary for us to say that where the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is . . . substantial evidence to support them; that we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom. No one seems to listen." (*Overton* v. *Vita-Food Corp.* (1949) 94 Cal. App.2d 367 at p. 370 [210 P.2d 757].)

■ RES JUDICATA DOES NOT BAR THE BOARD FROM FINDING THAT MONTEBELLO VIOLATED THE DUTY TO BARGAIN IN GOOD FAITH UNDER SECTION 1153, SUBDIVISION (e) EVEN THOUGH THE BOARD MADE A CONTRARY DETERMINATION UNDER SECTION 1155.2, SUBDIVISION (b)

In the fall of 1976, the UFW filed a petition with the Board for an extension of the certification period pursuant to section 1155.2, subdivision (b), alleging that Montebello had refused to bargain in good faith. The Board denied the request based upon the "union's failure to demonstrate that the Employer ha[d] violated [the statute]."

Montebello contends the doctrines of res judicata and collateral estoppel precluded the Board in the unfair practice proceeding from finding that Montebello had failed to bargain in good faith because this

---

for its actions. (*Texas Department of Community Affairs* v. *Burdine* (1981) 450 U.S. 248 [67 L.Ed.2d 207, 101 S.Ct. 1089] cf. *Mt. Healthy City Board of Ed.* v. *Doyle* (1977) 429 U.S. 274 [50 L.Ed.2d 471, 97 S.Ct. 568]; *Wright Line, Inc.* (1980) 251 N.L.R.B. 150 150.) This does not shift the burden of proof as to the unfair labor charge from the general counsel (Evid. Code, § 115).

We find nothing in the record to indicate a misallocation of the burden of proof either before the ALO or the Board. The fact finder was free to disbelieve the employer's witnesses.

issue had been resolved in Montebello's favor in the certification extension proceeding.[12]

The res judicata argument was asserted below and was rejected by the Board on the following grounds. First, the *general counsel* was not a party to the certification extension proceedings;[13] second, the extension proceedings are too dissimilar from unfair labor practice proceedings in that decisions in the former are usually made solely on the pleadings (as in this case) without the benefit of testimony or other evidence, whereas the unfair labor practice proceedings are adversary hearings with the benefit of witness testimony and cross-examination. (For this reason a Board order extending a union certification pursuant to § 1155.2, subd. (b) is not admissible as evidence of a refusal to bargain in the unfair practice proceeding (see Cal. Admin. Code, tit. 8, § 20382, subd. (g)). Third, the remedies available at the two types of proceedings are also quite different, with the possibility of severe economic consequences to the guilty party flowing from an unfair labor practice proceeding (see § 1160.3).

Finally, the Board noted that unlike private party litigation, the public has an important interest in administrative proceedings; hence, res judicata principles are to be more flexibly applied to protect the public interest. (*Hollywood Circle, Inc.* v. *Dept. of Alcoholic Beverage Control* (1961) 55 Cal.2d 728, 732 [13 Cal.Rptr. 104, 361 P.2d 712]; see generally, 2 Davis, Administrative Law Treatise (1958) § 18.03.)

We agree with the Board's reasoning. It is fundamental that before res judicata applies to a particular party in a subsequent proceeding, he must have been a party or in privity with a party in the prior proceeding. (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 813 [122 P.2d 892].) As noted, the general counsel, who can be said to represent the public in the prosecution of unfair labor practice charges, was neither a party nor in privity with a party to the certification extension proceeding; the public interest requires that relitigation of the good

---

[12]As requested by Montebello, we take judicial notice of the record in the certification extension proceedings in reaching our decision on the res judicata argument.

[13]Under the Act, the general counsel is not a Board agent but is an independent official charged with investigative and prosecutorial functions. He is also responsible for securing compliance with the Board's orders (see § 1149; Morris, The Developing Labor Law (1971) pp. 822-823). The general counsel also has final authority, on behalf of the Board, with respect to the investigation of charges and issuance of unfair labor practice complaints under the Act (§ 1149).

faith bargaining issue should be permitted in the unfair labor practice proceeding (cf. *Louis Stores, Inc.* v. *Department of Alcohol Beverage Control* (1962) 57 Cal.2d 749, 758 [22 Cal.Rptr. 14, 371 P.2d 758]). If the Board's decision in the certification proceeding were deemed conclusive, this would adversely affect the employees who have suffered economic harm from the employer's wrongful conduct; such a result would be contrary to the public interest.

The Board also makes a persuasive policy argument that if the certification extension determination were deemed conclusive to the end that the good faith bargaining issue could not be relitigated at the unfair labor practice hearing, the extension procedure would fall into disuse because unions would not want to risk losing in such proceedings thereby foreclosing the availability of the other beneficent remedies resulting from a finding of an unfair labor practice. As we shall explain below, this could not have been the intent of the Legislature when it enacted section 1155.2, subdivision (b).

### THE EMPLOYER'S DUTY TO BARGAIN CONTINUES AFTER THE EXPIRATION OF THE INITIAL CERTIFICATION YEAR

We turn now to the most difficult issue we confront in this review—namely, does an employer have a duty to continue bargaining with the labor organization which is originally certified as the employees' exclusive bargaining representative where an agreement or a bona fide impasse has not been reached by the end of the initial year and an extension of certification has not been granted under section 1155.2, subdivision (b)? The answer to this question involves an intricate process of statutory construction and reconciliation.

Montebello contends that it cannot be found to have violated the duty to bargain in good faith with the union after the certification year ended because the employer's duty to bargain under the Act is limited to unions *currently certified.* Montebello cites section 1155.2, subdivision (b) and section 1153, subdivisions (e) and (f) in support of its argument.

In *Kaplan's Fruit & Produce Co., Inc., supra,* 3 A.L.R.B. No. 28, the Board reached a contrary conclusion; it held that the employer's duty to bargain does not lapse after one year but continues until such

time as the union is officially decertified as the employee bargaining representative pursuant to the provisions of sections 1156.3 or 1156.7.

■ A guiding principle for evaluating the Board's decision in *Kaplan's* is that an administrative agency is entitled to strong deference when interpreting policy in its field of expertise. Since the ALRB is the agency entrusted with enforcement of the ALRA, "its interpretation of the Act [is] to be accorded 'great respect by the courts and will be followed if not clearly erroneous.'" (*San Diego Nursery Co.* v. *Agricultural Labor Relations Bd.* (1979) 100 Cal.App.3d 128, 140 [160 Cal.Rptr. 822], quoting from *Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 325 [109 P.2d 935]; see also *Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 111 [172 Cal. Rptr. 194, 624 P.2d 244].) Despite the deference which should be given to the Board, we nevertheless have an obligation to ascertain the intent of the Legislature so as to effectuate the purpose of the law. ■ "Thus, when administrative rules or regulations 'alter or amend the statute or enlarge or impair its scope,' they 'are void and courts not only may, but it is their obligation to strike down such regulations ...'" (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 29 [160 Cal.Rptr. 710, 603 P.2d 1306]).

■ Two main factors led the Board to the conclusion it reached in *Kaplan's*: NLRB precedent and agricultural policy considerations. The Board noted that under the NLRA, there is a rebuttable presumption that a certified union continues to enjoy majority status after the certification year expires. This presumption is designed to promote stability in the collective bargaining process. Until the presumption is rebutted, a prima facie case is established that an employer is obligated to continue bargaining with the union (*Kaplan's, supra*, p. 2, citing *Terrell Machine Co.* (1969) 173 N.L.R.B. 1480 [No. 230]). No section of the ALRA expressly negates this rule and the Board determined in *Kaplan's* that the NLRB presumption is not impliedly negated by the ALRA procedure for certification extension provided by section 1155.2, subdivision (b) (set forth *ante* at fn. 1). In *Kaplan's* the Board rejected the argument that since "certification" lapses after one year, the duty to bargain must also lapse. The Board said that certification is not a single, all-purpose concept but rather is a concept with two separate functions: (1) it creates a duty to bargain; and (2) it creates an election bar. While the code section implying the duty to bargain contains no express time limit (§ 1153, subd. (e)), the section creating the election bar does contain a one-year time limit (§ 1156.6). The Board therefore

concluded that "certification" lapses after one year for the purpose of the election bar, but not for the purpose of the bargaining duty. Accordingly, the Board determined that the procedures for extension of certification under section 1155.2, subdivision (b) are relevant only to the election bar.

The Board also noted that in deciding the issue "[t]he balance to be struck is between the employees' right to reject the incumbent union and the need for stability in bargaining relationships. The employer's 'right' not to bargain is no part of the equation." (*Kaplan's, supra*, at p. 4.)

The Board in *Kaplan's* next turned to the "powerful" policy considerations which reinforced the conclusion that the duty to bargain does not lapse at the end of the certification year. It stated that a contrary holding would undermine the ALRA's central purpose of bringing "certainty and a sense of fair play to a presently unstable and potentially volatile condition in the state" (Stats. 1975, Third Ex. Sess., ch. 1, § 1, p. 4013). It opined that a one-year limitation on the duty to bargain would inhibit good faith bargaining, noting how essential the passage of time may be to the proper nurturing of the collective bargaining process (see Cox, *The Duty to Bargain in Good Faith* (1958) 71 Harv.L.Rev. 1401, 1409).

The Board also opined that if the duty to bargain lapsed after one year, unions facing time pressures might be more prone to initiate strikes to force concessions from the employer.

A third policy consideration affecting the Board's decision was that if certification lapsed just after the peak season, as usually would be the case, another election might not be possible until the next peak season[14] thereby seriously impairing the employees' right to be represented by a union.

A fourth policy consideration which influenced the Board was the increased burden of requiring annual or biannual elections whenever the parties fail to reach an agreement within the initial certification year. The Board expressed the belief that there is no need to conduct a ritual

---

[14]Section 1156.4 provides that a representation petition shall not be timely unless the employers payroll reflects 50 percent of the peak agricultural employment for the current year.

reaffirmance of a union's certification where the employees are satisfied with their representative.

The Board held the Legislature could not have intended to "make the process of collective bargaining into a kind of sporting event in which the parties play against each other and against a clock at the same time, with the employees' right to effective representation as the stakes" (*Kaplan's, supra*, at pp. 6-7).

Finally, the Board considered the effect of section 1153, subdivision (f) on the duty to bargain after the certification year lapses.[15] It concluded that this section's prohibition against an employer's recognizing an uncertified union "is clearly directed, not towards an arbitrary time limit on bargaining, but towards preventing voluntary recognition of labor organizations." This section was intended only to guarantee freedom of choice to the employees through the machinery of secret ballot elections (*Kaplan's, supra*, p. 7, citing *Englund* v. *Chavez* (1972) 8 Cal.3d 572 [105 Cal.Rptr. 521, 504 P.2d 457]). The section should not preclude bargaining with a union which was chosen through a secret ballot election.

The Board's interpretation is supported by commentary from Professor Herman Levy, who served as a labor law consultant to the Agricul-

---

[15]Section 1153 provides in pertinent part: "It shall be an unfair labor practice for an agricultural employer to do any of the following:

". . . . . . . . . . . . . .

"(f) To recognize, bargain with, or sign a collective-bargaining agreement with any labor organization not *certified* pursuant to the provisions of this part." (Italics added.)

Other provisions of the Act refer to "certified" or "currently certified" labor organizations. Section 1153, subdivision (e) provides it shall be an unfair labor practice "To refuse to bargain collectively in good faith with labor organizations *certified* pursuant to the provisions of Chapter 5 (commencing with Section 1156) of this part." (Italics added.)

Section 1156.3, subdivision (a)(3) provides that a petition for an election shall allege, among other things, "[t]hat no labor organization is *currently certified* as the exclusive collective-bargaining representative of the agricultural employees of the employer named in the petition." (Italics added.)

Section 1156.7, subdivision (d)(3) provides that a petition for a decertification election shall allege among other things "[t]hat a labor organization, *certified* for an appropriate unit, has a collective-bargaining agreement with the employer which would otherwise bar the holding of an election and that this agreement will expire within the next 12 months." (Italics added.)

Section 1159 states: "In order to assure the full freedom of association, self-organization, and designation of representatives of the employees own choosing, only labor organizations *certified* pursuant to this part shall be parties to a legally valid collective-bargaining agreement." (Italics added.)

ture and Services Agency in the drafting of the ALRA. Levy explains the function of section 1153, subdivision (f) as follows: "One new provision contained in the ALRA makes it an unfair labor practice for an employer to recognize, bargain with, or sign a collective bargaining agreement with any labor organization not certified pursuant to the Act. This section ties in with the election procedure of the Act, which specifies that the sole means by which a labor organization can achieve certification as bargaining representative is to win a secret ballot election conducted by the board. These sections thus prohibit voluntary recognition of a labor organization by an employer based on authorization cards signed by the employees and presented by the labor organization, a practice permitted by decisions interpreting the NLRA. The ALRA's certification procedure reflects the feeling that the best method for determining the employees' choice of a bargaining representative is via the secret ballot election." (Levy, *The Agricultural Labor Relations Act of 1975-La Esperanza de California para el Futuro* (1975) 15 Santa Clara Law. 783, 789-790, fns. omitted.) Levy's foregoing comment suggests that the primary purpose of section 1153, subdivision (f) is to protect the secret ballot election process, not to limit the employer's duty to bargain with a union which has won an election.

Levy opines that because the NLRA presumption that an employer must continue to bargain after the certification year could be applied under the ALRA, the ALRA's express provision for extension of certification may have been superfluous (*id.*, at p. 790).

The Board rejected the idea that the decision in *Kaplan's* prejudiced employers in any way, because the policy of this state is that an employer has the duty to bargain collectively whenever its employees have properly designated their representative.

Montebello presents the following argument in rebuttal to *Kaplan's*: First, the Board erroneously applied NLRB precedent because there are important differences between the NLRA and ALRA. Montebello points out that under the NLRA, the duty to bargain arises whenever a union has majority status (*NLRB* v. *Gissel Packing Co.* (1969) 395 U.S. 575, 596-597 [23 L.Ed.2d 547, 568, 89 S.Ct. 1918]), whereas under the ALRA the duty to bargain is dependent upon certification by election. The NLRA has no counterparts to Labor Code sections 1159 and 1153, subdivision (f). Section 1159 provides that only "certified" labor organizations can be a party to a legally valid collective bargaining agreement. Section 1153, subdivision (f) makes it an unfair labor prac-

tice for an employer to bargain with a union which is not certified. There is also no counterpart under the NLRA for the ALRA's provision to extend certification beyond the 12-month period if the employer bargains in bad faith (§ 1155.2, subd. (b)). Montebello argues that the cited sections in the ALRA, with no federal counterparts, show that the ALRA is unique in that the duty to bargain is expressly tied to the concept of certification.

Another difference between the ALRA and the NLRA pointed out by Montebello is that under the federal act an employer may petition for an election when there are conflicting claims to representation (29 U.S.C. § 159 (c)(1)(b)), whereas the ALRA has no provision for an employer initiated election. However, we fail to see the relevance of this distinction with respect to the question presented here. So long as the employees can petition for a new election if they wish to remove the union, the employer has no real cause for concern about whether it is bargaining with the true representative of its employees.

Montebello contends the *Kaplan's* decision will have adverse consequences for employees' ability to choose their bargaining representative, because if no contract is reached in the first 12 months, certain provisions of the ALRA would prohibit the employees from removing the union until a collective bargaining agreement was reached. According to Montebello, the employees would be "bound forever" to a particular union unless an agreement was reached. This assertion is apparently based on Montebello's reading of sections 1156.3 and 1156.7. However, Montebello's interpretation of the Act appears incorrect; nothing in the Act would bar an election after the initial certification year, unless certification is extended under section 1155.2. Section 1156.7 provides the mechanism for holding an election where a collective bargaining agreement is in effect. Section 1156.3 provides the procedure for workers to petition for an election when no collective bargaining agreement is a bar and when "no labor organization is *currently certified* as the exclusive collective-bargaining representative of the agricultural employees of the employer named in the petition." (§ 1156.3, subd. (a)(3), italics added.) Thus, the employees could still petition for an election under section 1156.3 assuming that "certification" does lapse after one year for purposes of the election bar, but not for purposes of the duty to bargain.

Montebello vigorously disputes the argument that certification lapses after 12 months for purpose of the election bar independently of any ef-

fect on the duty to bargain. It argues that the code sections dealing with the duty to bargain when a union is certified are interrelated with the code section embodying the election bar doctrine (§ 1153, subds. (e) & (f); § 1155.2 and § 1156.6 and § 1159); Montebello argues that all of these sections must be construed together and the construction which must follow is that "if a union's certification obtained pursuant to Labor Code §§ 1156, et seq., has expired and no extension of certification pursuant to § 1155.2 has been obtained, then the union is no longer certified. If a union is no longer certified, there is no election bar under § 1156.6 and there is no duty to bargain under § 1153(e)." Montebello argues that the word "certified" means one thing throughout the Act, notwithstanding the Board's attempt to splinter this concept. According to Montebello, certification "is not a chameleon concept which changes its duration depending upon whether it serves as an election bar or as establishing the duty to bargain."

We recognize the Board's decision in *Kaplan's* can be characterized as a somewhat strained interpretation of the literal wording of the Act. Nevertheless, the Board's interpretation does appear to be true to the underlying purpose of the Act as a whole—to promote stability in the agricultural fields through collective bargaining. As previously noted, *Kaplan's* avoids a "Beat the Clock" approach to collective bargaining; proper nurturing of the bargaining process often requires the passage of considerable time. As noted by Professor Cox: "Collective bargaining is curiously ambivalent . . . . In one aspect collective bargaining is a brute contest of economic power somewhat masked by polite manners and voluminous statistics. As the relation matures, Lilliputian bonds control the opposing concentrations of economic power; they lack legal sanctions but are nonetheless effective to contain the use of power. Initially it may be only fear of the economic consequences of disagreement that turns the parties to facts, reason, a sense of responsibility, a responsiveness to government and public opinion, and moral principle; but *in time* these forces generate their own compulsions, and negotiating a contract approaches the ideal of informed persuasion." (Cox, *The Duty to Bargain in Good Faith, supra,* 71 Harv. L.Rev. 1401, 1409, italics added.)

Because of these policy considerations, we believe it is appropriate for this court to give deference to the Board's interpretation of the Act. (*Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd., supra,* 29 Cal.3d 101, 111; *San Diego Nursery* v. *Agricultural Labor Relations Bd., supra,* 100 Cal.App.3d 128, 140.) We therefore approve

*Kaplan's* on the employer's duty to bargain beyond the initial certification year.

### ■ THE SIX MONTHS LIMITATION PERIOD IN SECTION 1160.2 DOES NOT APPLY TO RESTRICT THE PERIOD DURING WHICH THE MAKE-WHOLE REMEDY COULD BE IMPOSED

Montebello contends the Board improperly failed to apply the six-month statute of limitations contained in section 1160.2. That section provides in pertinent part: "No complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the board and the service of a copy thereof upon the person against whom such charge is made . . . ." The first charge alleging bad faith refusal to bargain was filed on October 22, 1976, and the ALO concluded that the make-whole remedy could only be imposed from April 22, 1976, because section 1160.2 barred a remedy based on Montebello's conduct prior to that date. However, the Board disagreed with the ALO as to the effect of the statute of limitations and imposed the make-whole remedy from the period commencing February 4, 1976—the date the Board determined was Montebello's first act of bad faith.

The Board reasoned that the limitation period in section 1160.2 began to run only when the union discovered, or in the exercise of reasonable diligence should have discovered, the alleged violation. The Board noted that it is particularly appropriate to apply this tolling principle to surface bargaining cases because the violation may be difficult to discover during the initial stages of negotiations since the employer's conduct may resemble good faith bargaining. The Board found that the union had no notice of Montebello's bad faith until the contrived impasse was declared on June 10, 1976. Therefore, under the Board's analysis, the six-month limitations period was tolled until that date.

The NLRA contains a virtually identical statute of limitations and the NLRB and federal courts have applied the same tolling principle the Board applied here—namely, the limitations period begins when the claimant obtains actual or constructive notice of the violation (*N. L. R. B.* v. *Don Burgess Const. Corp.* (9th Cir. 1979) 596 F.2d 378, 382-383). Since the ALRA's statute of limitations has an identical counterpart in the NLRA, it was appropriate for the ALRB to follow NLRB precedent (Lab. Code, § 1148).

The ALRB also followed the NLRB's method of formulating a remedy in tolling cases, i.e., where the limitations period has been tolled as to the cause of action until the charging party had notice, it is likewise tolled as regards the remedy. "To find otherwise would allow [the employer] to escape from providing a full remedy as a result of the successful concealment of [its] unlawful conduct" (*Burgess Construction* (1977) 227 N.L.R.B. 765, 766, enforced 596 F.2d 378).

Because the tolling principle has been properly applied, and because there is substantial evidence to support the finding that Montebello first acted in bad faith on February 4, 1976, the Board correctly imposed the make-whole remedy from that date onward.

### The Communications Between Montebello's General Manager Barwick and Its Negotiator Jory Are Not Privileged

Montebello contends that the ALO erred by admitting evidence of certain communications between Montebello and its attorney-negotiator Jay Jory relating to the conduct of the negotiations. Montebello argues that all communications with Jory were protected by the attorney-client privilege because they had "legal significance."

The ALO ruled that only the communications with Jory in his capacity as an attorney were privileged and that the other communications with Jory in his capacity as a negotiator were admissible. The ALO conducted an *in camera* inspection of all communications subpenaed by the general counsel. Following this inspection, the ALO determined which documents or portions thereof involved a request for or the giving of legal advice. Those communications not involving legal advice were ordered produced and many were admitted into evidence over Montebello's objection. The subpena was quashed as to the communications in which Jory acted in his capacity as an attorney.

The Board affirmed the ALO's ruling. The Board's opinion noted that a communication does not fall within the attorney-client privilege unless the *dominant purpose* of the communication is a furtherance of the attorney-client relationship (*Holm* v. *Superior Court* (1954) 42 Cal.2d 500, 507 [267 P.2d 1025, 268 P.2d 722]). The Board concluded it was possible to separate an attorney's communications in a legal capacity from those in his nonlegal capacity as a labor negotiator and rejected Montebello's argument that *all* communications with Jory re-

garding the negotiations were privileged because the roles of attorney and negotiator are inextricably interwoven. The Board opined that if Montebello's argument were accepted, it would unfairly reward those organizations able to hire attorneys as their negotiators because their communications concerning pending negotiations would be protected, whereas the communications of organizations with lay negotiators would not receive protection. Finally, the Board noted that in the context of the present case, the question of the privilege's applicability had little significance to the outcome because "the evidence of [Montebello's] bad-faith bargaining is overwhelming and we would reach the same conclusions even without reference to the communications in question."

In *Holm* v. *Superior Court, supra*, 42 Cal.2d 500, our Supreme Court held that the attorney-client privilege attaches only where the communication is made in confidence pursuant to a client-attorney relationship *with respect to the particular matter* (Italics added, *id.*, at p. 507). Furthermore, "To make the communication privileged the dominant purpose must be for transmittal to an attorney 'in the course of professional employment'" (*ibid.*; see also 31 Cal.Jur.3d, Evidence, § 435, pp. 571-573 and § 439, at p. 586). The privilege does not apply to communications to an attorney who is transacting business that might have been transacted by another agent who is not an attorney (*id.*, at § 435, p. 573).

Since Montebello's labor negotiations could have been conducted by a nonattorney, it is self-evident that communications with Jory relating to the conduct of those negotiations were not privileged unless the dominant purpose of the particular communication was to secure or render legal service or advice. The fact that some of the communications involved strategy decisions regarding conduct of the negotiations which may have had "legal significance" with regard to a future unfair labor practice charge, i.e., the alleged failure to negotiate in good faith, does not mean that the dominant purpose of these communications was of a legal nature.

Montebello's citation to *Schlumberger Limited* v. *Superior Court* (1981) 115 Cal.App.3d 386 [171 Cal.Rptr. 413] for a contrary rule is misplaced. That case involves the question of the attorney-client privilege as to an attorney representing a client who is suing the client's former attorney for malpractice. The case has no relevance to the question before us—that of an attorney who is acting as a labor negotiator

rather than as an attorney. Whether a particular communication is predominantly in furtherance of the attorney-client relationship is a question of fact (*Holm* v. *Superior Court, supra*, 42 Cal.2d at p. 507). Montebello makes no showing that the ALO erred in determining the dominant purpose of the particular communications it admitted.

We have also considered and reject Montebello's alternative contention that if this court determines that the attorney-client privilege does not attach to all communictions between Jory and the company relating to the conduct of the negotiations, the ALO acted arbitrarily and capriciously in determining which particular communications should be deemed privileged. Montebello argues that some of the communications excluded should have been admitted under the ALO's stated criterion for determining whether the privilege applied. It further suggests that certain of the communications were excluded precisely because they would have shown that Montebello was willing to bargain in good faith even after the budding season ended.[16]

The only communication which Montebello cites as showing evidence of its good faith attempt to bargain after the impasse appears to fall within the attorney-client privilege, because it related to Montebello's reaction to the union's petition for extension of certification. In this instance, Jory would seem to be acting as an attorney for Montebello; hence, exclusion of this communication was proper.

The other communications between Jory and Montebello which were excluded do not add anything material to the evidence; therefore, even if the ALO committed any error in determining these communications were inadmissible, the error was harmless.

We next consider the effect of a recent Board ruling on an employer-negotiator privilege. At oral argument, the Board's counsel provided this court and opposing counsel with a copy of a Board decision dated March 31, 1981, entitled "Ruling on Motion to Revoke Subpoena" in the case of *Vessey and Company, Inc. et al.*, respondents, and *United Farm Workers of America, AFL-CIO*, petitioner, No. 79-CE-145-EC. In that ruling (hereinafter *Vessey*), the Board reversed the ALO and granted the employers' motion to revoke the general counsel's subpena insofar as it sought "production of any written communication between

---

[16]These communications were made a part of the record on appeal by an order augmenting the record, filed on March 4, 1980.

[the employers] . . . and their attorney(s) or negotiator(s), or any records of telephonic and personal conversations between or among any of the said persons, bearing on their collective-bargaining negotiations with the [UFW] . . . ." The Board's ruling in *Vessey* "is based on considerations of privacy and confidentiality, and on the lack of probative value of some of the documents sought by the General Counsel." (*Vessey, supra*, p. 1.) The Board further stated "Our ruling herein is not based on the work-product doctrine, or on any application or extension of the attorney-client privilege, or on the creation of any new privilege." (*Id.*, at p. 1, fn. 1.)

Montebello argues that *Vessey* demonstrates the Board erred in the present case in not granting Montebello's motion to revoke the subpena duces tecum concerning communications between Montebello and Jory. The argument requires this court to pass on the validity of the *Vessey* ruling.

In *Vessey*, by a two-to-one decision (member Ruiz dissenting), the Board purports to create a "privacy and confidentiality" privilege. It asserts that its ruling follows NLRB practice of "consistently" recognizing a right of privacy by parties to the collective-bargaining process with respect to communications between a party and its negotiator, whether an attorney or a nonattorney. The Board says "[t]his privacy attaches to all oral, telephonic, and written communications related to the collective-bargaining process," citing *J. H. Rutter-Rex Manufacturing Company* (1966) 158 N.L.R.B. 1414 [No. 122]; *Berbiglia, Inc.* (1977) 233 N.L.R.B. 1476; *Hickman v. Taylor* (1947) 329 U.S. 495 [91 L.Ed. 451, 67 S.Ct. 385].

We have examined the cited authorities and while they do contain some language which taken out of context might suggest a rule of privacy in labor negotiations insofar as communications between a party and his negotiator, they do not stand for the broad rule asserted by the *Vessey* majority. In *J. H. Rutter-Rex Manufacturing Company, supra*, 158 N.L.R.B. 1414, the NLRB was not even considering the question of privacy between negotiator and client. That case involved an unfair labor practice charge against an employer of unlawfully prolonging a strike of its employees and the application of the work-product privilege to documents subpenaed by the employer from the general counsel. The documents sought by the employer included memorandums and reports prepared by various agents of the Board and general counsel in the course of their investigation of the case. The Board in a passing refer-

ence commented that the subpenas "went too far, for to have required such production would have violated rights of privacy in the 'work-product' of such agents under the doctrine of *Hickman* v. *Taylor* . . ." (*id.,* at p. 1417).

In *Hickman* v. *Taylor, supra,* 329 U.S. 495, the question was whether written and oral statements of witnesses obtained by defense counsel in a potential wrongful death case as well as notes and memorandums prepared by the attorney concerning the possible litigation should be produced for examination by opposing counsel. The Supreme Court held that the witnesses' statements and defense counsel's memorandums were not within the attorney-client privilege (*id.,* at p. 508 [91 L.Ed. at pp. 460-461]); however, the notes prepared by the attorney were the "work-product" of the attorney and should not be produced absent a showing of absolute necessity at trial (*id.,* at pp. 510-514 [91 L.Ed. at pp. 462-464]). *Hickman* speaks to discovery of information acquired by opposing counsel "in the course of preparation for possible litigation after a claim has arisen." (*Id.,* at p. 497 [91 L.Ed. at p. 455].) Justice Jackson concurred by saying "[d]iscovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary." (*Id.,* at p. 516 [91 L.Ed. at p. 465].)

Notes and communications between an employer and his negotiator relating to collective bargaining currently in progress are clearly distinguishable from information secured or prepared by an attorney in preparation for litigation.[17]

In *Berbiglia, Inc., supra,* 233 N.L.R.B. 1476, again the question of a negotiator-client right of privacy was not before the Board. The issues were whether the employer had misrepresented the union's continuing desire to represent the employees and solicited the employees to resign from the union and abandon the strike. The subpena that was revoked lacked sufficient specificity in its search for union records; it was revoked on the grounds that it would subvert the relationship between the union and its members (*id.,* at p. 1495). In the ALO's decision which was attached to the NLRB decision, it is stated "I revoked the major

---

[17]We do not pass on the question whether Jory's communications to Montebello constitute the "work product" of an attorney within the meaning of Code of Civil Procedure section 2016, subdivision (b), since this theory was not asserted below either before the ALO or the Board.

part of subpoenas duces tecum by which [the employer] sought to obtain a wide ranging examination of the Union's records, including communications between the Union and its members and other organizations." (*Ibid.*)

Regardless of the Board's disclaimer that its ruling in *Vessey* is not based on the creation of any new privilege but merely on "considerations of privacy and confidentiality," the effect of its ruling is to fashion a new privilege.

■ The essence of a privilege is the right to refuse to disclose any matter or to produce any writing, object or thing. (Evid. Code, § 911.) Privileges are "designed to protect personal relationships or other interests where the protection of confidentiality is considered more important than the need for the evidence." (Witkin, Cal. Evidence (2d ed. 1966) § 778 at p. 724.) ■ The creation of a privilege is a legislative matter. Evidence Code section 911 provides that "[e]xcept as otherwise provided by statute ... [n]o person has a privilege to refuse to disclose any matter or to refuse to produce any writing, object or other thing." (Evid. Code, § 911, subd. (b).) The Law Revision Commission's comment to section 911 emphasizes the absolute policy of confining privileges to those created by statute: "This section codifies the existing law that privileges are not recognized in the absence of statute [citations]. This is one of the few instances where the Evidence Code precludes the courts from elaborating upon the statutory scheme."

Section 1160.2 requires the Board to follow the Evidence Code in the conduct of unfair labor practice proceedings "so far as practicable." This language is based on similar language under the federal statute (29 U.S.C. § 160 (b)) which has never been used to authorize the NLRB to create new privileges. Indeed, any attempt by the NLRB to create a new privilege under the federal act has been rejected: "Section 10(b) provides that any unfair labor practice proceeding shall, 'so far as practicable,' be conducted in accordance with the rules of evidence .... The words 'so far as practicable,' are intended to authorize the Board to depart from rules of evidence applicable in the federal district courts to the extent that this is necessary because of the peculiar characteristics of administrative hearings. But, as the Fifth Circuit held in N.L.R.B. v. Capitol Fish Co. 5 Cir., 294 F.2d 868, 872, no special characteristics of an administrative hearing justify the exclusion of evidence or the revocation of subpoenas which it would be error to exclude or revoke in a federal district court trial.

"It follows that section 102.118 of the Board's rules and regulations was invalidly applied if it effectuated the exclusion of evidence which was not shown to be a kind which would be inadmissible under the general rules of evidence, such as evidence which is irrelevant or immaterial, or is privileged under some express statutory provision or under some rule of evidence cognizable in the federal district courts, such privilege being claimed, or which was not shown to have been sought pursuant to subpoenas which were irregularly issued, oppressive in scope, or by reason of some other circumstance, subject to revocation under federal district court procedure." (*General Engineering, Inc.* v. *N.L.R.B.* (9th Cir. 1965) 341 F.2d 367, 374-375.)

Privileges contained in the Evidence Code are *exclusive* and courts are not free to create new privileges as a matter of judicial policy. (*Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652, 656 [125 Cal.Rptr. 553, 542 P.2d 977].) If the courts are not free to create new privileges as a matter of policy, the Agricultural Labor Relations Board may not do so.

The Board's decision in *Vessey* is of no aid to Montebello.

### The Matter Should Be Remanded to the Board for Reconsideration of the Make-whole Remedy in Light of the Decision in J. R. Norton v. ALRB

Montebello lastly contends that even if this court determines the employer has a continuing duty to negotiate with the union after the expiration of the initial certification year, the imposition of the make-whole remedy for the period after the certification year was improper in the present case because the refusal to bargain beyond the initial year was made in good faith. Montebello sincerely believed that under section 1155.2, subdivision (b), it had a lawful right to refuse to bargain at the end of the certification year. As we have explained, this question regarding the duration of the duty to bargain is a complex and unique question of law. It reasonably can be argued that Montebello acted in good faith when it filed the Kern County declaratory relief action to obtain a resolution of the question. However, in April 1977, the Board rendered its decision in *Kaplan's*. At this point in time Montebello was on notice of the Board's answer to the question; thus, the issue remains whether Montebello then should have commenced bargaining.

■ *J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d 1, holds that the automatic award of make-whole relief under section 1160.3 in a technical refusal to bargain case[18] is an abuse of discretion. The court emphasized that the statutory language authorizing the Board to order make-whole relief when it "deems such relief appropriate" requires the Board to evaluate the facts and equities of the particular case to determine whether the employer acted in good faith in challenging the election certification. (*Id.,* at p. 35.) By analogy, Montebello argues and the Board concedes that the make-whole remedy in the present case should be remanded for a specific determination by the Board as to Montebello's good faith in refusing to bargain with the UFW after the close of the initial year. Since *Norton* was decided after the Board rendered its decision in the present case, it appears that the Board applied the improper standard of *Perry Farms, Inc.* (1978) 4 A.L.R.B. No. 25 which was disapproved in *Norton.* (See 26 Cal.3d at pp. 27-35.)

The Board's decision on the merits is affirmed.

The matter is remanded to the Board for further consideration of the make-whole remedy in light of this opinion and the circumstances of the case.

Brown (G. A.), P. J., and Zenovich, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied August 7, 1981. Bird, C. J., did not participate therein. Richardson, J., was of the opinion that the application should be granted.

---

[18]A "technical" refusal to bargain occurs when the employer refuses to bargain in order to seek court review of the propriety of a certification election. Because the ALRA does not provide for immediate judicial review of a Board order certifying a union, to obtain such review the employer must first be found guilty of an unfair labor practice (*Norton, supra,* 26 Cal.3d at pp. 10, 27).