[No. D042323. Fourth Dist., Div. One. Dec. 5, 2003.]

2,022 RANCH, L.L.C., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
CHICAGO TITLE INSURANCE COMPANY, Real Party in Interest.

Counsel

Lindley, Scales & Corbett and Luke R. Corbett for Petitioner.

No appearance for Respondent.

Andersen, Buck & Mann and M. Steven Andersen for Real Party in Interest.

Miller, Starr & Regalia, Richard Glen Carlston, Kenneth R. Styles and Christopher H. Doyle for California Land Title Association as Amicus Curiae on behalf of Real Party in Interest.

Opinion

**NARES, Acting P. J.**—This petition for writ of mandate arises out of the court's denial of petitioner 2,022 Ranch, LLC's (2,022 Ranch's) motion to compel deposition testimony and to produce documents brought against real party in interest Chicago Title Insurance Company (Chicago Title). 2,022 Ranch sued Chicago Title for its bad faith in failing to pay 2,022 Ranch's claim it filed for damages it allegedly suffered as a result of undisclosed exceptions in a title insurance policy Chicago Title issued as part of 2,022 Ranch's purchase of 2,022 acres of undeveloped land in the Jamul area of San Diego County. 2,022 Ranch sought documents from Chicago Title's claims file and also to depose claims handlers and their supervisors concerning Chicago Title's handling of and refusal to pay 2,022 Ranch's claim. Chicago Title asserted the attorney-client privilege and attorney work product privilege as to certain documents contained in the claims files and to certain questions posed by 2,022 Ranch at depositions of Chicago Title employees. Specifically, Chicago Title asserted that 2,022 Ranch was not entitled to confidential communications between its in-house claims adjusters, who were also attorneys, and Chicago Title concerning 2,022 Ranch's claim.

The motion to compel production of documents was referred to a referee, the Honorable Anthony C. Joseph, retired judge of the Superior Court of San Diego County. The motion to compel answers to deposition questions was denied without prejudice pending the outcome of the document production dispute. Judge Joseph recommended that the court uphold Chicago Title's assertion of the attorney-client privilege as to all but two documents in dispute and as to all deposition questions in dispute. The court adopted the referee's recommendation and it became the order of the court, resulting in a denial of both the motion to compel documents and the motion to compel answers to deposition questions.

2,022 Ranch asserts that the court erred in denying its motion to compel because (1) the dominant purpose of the claims handler review of 2,022

Ranch's claim was the investigation and administration of the claim and, therefore, even though the claims handlers were also attorneys, no attorney-client privilege attached to their communications; and (2) no attorney-client privilege attaches to items in a claims file in first party bad faith actions. We conclude that the court erred in failing to review each deposition question and withheld document to determine which constituted Chicago Title's factual investigation of 2,022 Ranch's claim and which constituted privileged attorney-client communications or protected work product. The matter is remanded for a new hearing consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. *Factual Background*

In December 1999, 2,022 Ranch opened an escrow with Bishop Escrow, Inc. (Bishop Escrow), for the purchase, for the price of $5 million, of approximately 2,022 acres of undeveloped land in the area of Jamul, California commonly known as Honey Springs Ranch (the property). 2,022 Ranch purchased the property with the intent to develop it with residences for resale. Dr. Jerry R. Argovitz was the principal officer of 2,022 Ranch.

In January 2000 California Title Company (California Title), acting as the agent of Chicago Title, issued a preliminary title report for the property, which was delivered to Bishop Escrow and in turn to 2,022 Ranch.[2] The report stated that California Title was prepared to issue a title insurance policy for the property that would insure against losses relating to defects or encumbrances to title, except for 16 identified encumbrances and exceptions. The escrow closed in May 2000 without any amendments to the preliminary title report.

In July 2000 Chicago Title issued a title insurance policy in favor of 2,022 Ranch. The title insurance policy listed 16 additional exceptions to coverage

---

[1] Much of the factual background for this opinion has been taken from the allegations stated in 2,022 Ranch's complaint, which, for purposes of resolving the legal issues raised in this petition, Chicago Title did not dispute in its brief filed on this petition. We recognize that Chicago Title reserves the right to contest the allegations of 2,022 Ranch's complaint at trial and nothing in this opinion should be construed as adopting 2,022 Ranch's allegations as proven facts.

[2] "Preliminary title reports" or "preliminary reports" are merely reports on the status of title and are not themselves insurance policies that could provide the basis for a cause of action against a title company. (Ins. Code, § 12340.11; Greenwald & Asimow, Cal. Practice Guide: Real Property Transactions (The Rutter Group 2003) 3:3, p. 3-2; *Rosen v. Nations Title Ins. Co.* (1997) 56 Cal.App.4th 1489, 1499-1500 [66 Cal.Rptr.2d 714].) Cases and treatises use both terms to describe such reports (Greenwald & Asimow, Cal. Practice Guide: Real Property Transactions, *supra*, 3:3, p.3-2; *Rosen v. Nations Title Ins. Co., supra,* at pp. 1499-1500), and we use the term "preliminary title report" in this opinion to describe the type of report defined in Insurance Code section 12340.11.

that were not identified in the preliminary title report and that had not been disclosed to 2,022 Ranch in any other manner. The encumbrances included a recorded contract with water districts for deferred stand-by water charges with a total of approximately $800,000 owing, as well as easements for road purposes, utility easements, and boundary discrepancies. According to 2,022 Ranch, these new exceptions created serious financial and practical barriers to developing the property as it intended, resulting in lost profit damages of $17 million.

After receiving the title insurance policy, 2,022 Ranch presented a claim to Chicago Title requesting that it either eliminate the exceptions to title or compensate 2,022 Ranch for its damages. According to 2,022 Ranch, it tried unsuccessfully for 15 months to receive a response to its claim.

### B. *Procedural Background*

#### 1. *The complaint*

In September 2001, 2,022 Ranch filed an action against Chicago Title for breach of the insurance contract and bad faith handling of its claim. Chicago Title initially denied 2,022 Ranch's allegations, but then admitted that it was liable for the damages caused by the unauthorized exceptions to coverage and admitted liability for both breach of contract and bad faith handling of 2,022 Ranch's claim.[3] However, 2,022 Ranch asserts that the damages offered by Chicago Title ($270,000) were only a small portion of the damages it suffered. 2,022 Ranch thereafter amended its complaint to seek punitive damages as a result of Chicago Title's conduct, alleging that Chicago Title's actions in refusing to timely accept its claim were fraudulent, malicious and oppressive.

2,022 Ranch also named Bishop Escrow as a defendant, asserting that it breached its duties related to the escrow on the purchase by delivering the faulty preliminary title report.

#### 2. *Document request*

2,022 Ranch served two sets of requests for production of documents on Chicago Title, seeking all documents related to 2,022's title insurance policy,

---

[3] In a petition for rehearing, Chicago Title asserted that it did not admit liability for breach of contract or bad faith and pointed to its answer to 2,022 Ranch's second amended complaint, which it attached as an exhibit to the petition for rehearing. However, the record reflects that Chicago Title opposed the motion to compel on the basis that the discovery sought was irrelevant because it had admitted bad faith, the referee assigned to handle the discovery dispute found Chicago Title had admitted bad faith, and Chicago Title did not assert that it was still contesting its alleged bad faith in its respondent's brief. Further, Chicago Title did not make its answer to the second amended complaint a part of the record on this petition. At any rate, as discussed in footnote 1, *ante*, we note that this statement is an allegation made by 2,022 Ranch, and we leave to the trial court resolution of the issue of what admissions were made by Chicago Title for purposes of trial.

the preliminary title report, 2,022's claim on the policy, and Chicago Title's investigation and handling of 2,022 Ranch's claim. Chicago Title objected to the production of certain documents on the ground they were protected by the attorney-client or attorney work product privileges and produced a privilege log identifying the documents it was not producing. The majority of the documents on the privilege log were identified as (1) correspondence among claims handlers, (2) correspondence between claims handlers and individuals and entities involved in the issuance of 2,022 Ranch's title policy; (3) memos to the file by claims adjusters concerning the claim; and (4) transmittal of information concerning 2,022 Ranch's claim by claims adjusters to their superiors.

### 3. *Deposition questions*

2,022 Ranch deposed claims personnel at Chicago Title. Debra Look, Chicago Title's employee who was primarily responsible for 2,022 Ranch's claim, testified that her job description was "claims handler." She also testified that she was a licensed attorney. She testified that her job duties were to "investigate the claims, determine if there was coverage, and then . . . either deny the claim or make the appropriate payment if there was coverage." At her deposition, counsel for Chicago Title interposed objections to several questions posed to Look on the basis of the attorney-client or attorney work product privilege, and instructed her not to answer those questions. For example, counsel objected on the basis of the attorney-client or attorney work product privilege to the following questions:

"Did you ever make any request of California Title yourself that they provide you with complete copies of everything they had pertaining to the 2,022 Ranch claim?"

"What was the gist of your conversation with Ms. Bishop [escrow officer for Bishop Escrow] on the subject [of 2,022 Ranch's claim]?"

"Did you ask Ms. Bishop whether or not the form of the preliminary . . . title report that she sent to 2,022 Ranch and Dr. Argovitz was the same as the form that she sent to you . . . ?"

"[W]as [the idea to get a statement under oath from Dr. Argovitz] your idea, or was that a recommendation made to you by somebody else at Chicago Title?"

"What questions did you have of Mr. Nenner [the seller's real estate broker on the transaction] regarding this claim?"

"You said you spoke to Mr. Dondanville [claims supervisor] and told him you wanted to discuss the file. What were the issues about the file that you wanted to discuss?"

"What was the discussion that took place at that meeting [with Mr. Dondanville] relative to the file."

"Was there a factual basis within [Chicago Title's] knowledge as of early June, June 10, 2001, for not admitting liability?"

"Was there a factual basis within your knowledge as of about June 10, 2001, for not admitting liability on the claim of 2,022 Ranch?"

Jeff Dondanville, also a licensed attorney, was the regional claims manager in charge of the claims handlers (or "claims attorneys" as he referred to them) at Chicago Title, including those reviewing 2,022 Ranch's claim. He testified that his duties were to "hire and advise and retain claims attorneys and other persons to handle claims for the company, manage the claims department, [and he was] involved in determining the policy and procedures of how the claims department operates." He confirmed that the primary function of the claims handlers was "to investigate claims that come in, analyze them, and administer [them], in terms of dealing with the insured or the claimant." Chicago Title objected to the following deposition questions of Dondanville, and instructed him not to answer on the basis of attorney-client or attorney work product privilege:

"Do you recall whether the 2,022 Ranch claim was reported to you [as a claim with a potential loss and expense total exceeding $100,000]?"

"Do you recall whether the 2,022 Ranch claim was deemed by the claims · department at Chicago Title to be one with a potential loss and expense total exceeding $100,000 at any time?"

"Did you determine that this matter should be reviewed by other senior counsel or general counsel?"

"Did you, in fact, ask other senior counsel or the general counsel to review this matter?"

"[W]as the 2,022 Ranch claim one which was a matter which had a, quote, reasonable potential of exceeding a total loss and expense of $1 million?"

"Was the 2,022 Ranch claim disclosed to general counsel?"

"And what was the substance of the conversation between [you and senior claims counsel Gary Urquhart] on the topic [of Look's written submission that Dondanville forwarded to Urquhart]?"

"What was the reason [Chicago Title did not accept or deny 2,022 Ranch's claim within 40 days as recommended by its claims manual]?"

"What is [the] information or knowledge [you have as to the factual basis for Chicago Title failure to accept liability on 2,022 Ranch's claim]?"

"[W]as the failure of Chicago Title to accept liability on the [claim] based on any specific policy provision or condition or exclusion?"

### 4. *Motion to compel*

In December 2002, 2,022 Ranch brought a motion to compel production of the documents withheld by Chicago Title and to compel answers to the deposition questions quoted above. 2,022 Ranch asserted that the documents withheld by Chicago Title and the deposition questions objected to were properly the subject of discovery because the dominant purpose of Chicago Title's claims handlers was the investigation and settlement of claims, and Chicago Title could not shield their activities from discovery by hiring attorneys to perform those functions.

Chicago Title opposed the motion, arguing that the information was protected by the attorney-client and attorney work product privileges because its claims handlers were licensed attorneys who were acting as attorney advisors and legal advocates for Chicago Title, not merely as claims adjusters. In support of its opposition, Chicago Title submitted the declaration of John Hilbert, vice-president and associate counsel for Chicago Title. Hilbert stated that Chicago Title's attorney/claims handlers were "employed by Chicago Title for the primary purpose of investigating claims and making coverage recommendations under applicable title policies." He also stated that they were "relied upon by Chicago Title for their legal expertise and training, and their ability to interpret title policies, determine coverage, as well as to assess and provide legal advice as to coverage issues."

### 5. *Referral to referee*

The court ordered the dispute over the document requests referred to a discovery referee for resolution. The court also denied 2,022 Ranch's motion to compel answers to deposition questions without prejudice pending the outcome of the document production dispute. The parties stipulated to the appointment of Judge Joseph to act as the referee on the dispute.

In February 2003 Judge Joseph issued his recommendation concerning the discovery dispute, following his review of the disputed documents. Judge Joseph found that the attorneys employed by Chicago Title were not "engaged in activity beyond claims review and analysis" and that assertion of the

attorney-client privilege "may interfere with a clear understanding of the circumstances of this matter." Judge Joseph also found that the requested information was relevant, despite Chicago Title's admission of liability, because of 2,022's allegations that its actions were willful, malicious and oppressive and justified an award of punitive damages. Nevertheless, Judge Joseph found that the attorney-client and attorney work product privileges were "appropriate and must be upheld." However, Judge Joseph did find that two documents out of the 65 disputed were not privileged and should be produced to 2,022 Ranch.

### 6. *Court's decision*

In April 2003 the court adopted Judge Joseph's recommendation, finding that "insofar as the document demands and requests to compel answers to deposition questions present issues of the attorney[-]client privilege applying to attorneys acting as claims reviewers, the attorney[-]client privilege precludes discovery . . . ."

## DISCUSSION

### I. *Standard of Review*

A trial court's determination of a motion to compel discovery cannot be overturned in the absence of an abuse of discretion. (*Dickerson v. Superior Court* (1982) 135 Cal.App.3d 93, 98 [185 Cal.Rptr. 97].) If the privilege does not appear as a matter of law, the appellate court may not disturb the lower court's findings if there is any substantial evidence to support them. (*D. I. Chadbourne, Inc. v. Superior Court* (1964) 60 Cal.2d 723, 729 [36 Cal.Rptr. 468, 388 P.2d 700].) The appellate court may not weigh the evidence, resolve conflicts in the evidence, or resolve conflicts in the inferences that can be drawn from the evidence. If there is substantial evidence in favor of the finding, no matter how slight it may appear in comparison with the contradictory evidence, the finding must be affirmed. (9 Witkin, Cal. Procedure (4th ed. 1997), Appeal, §§ 359, 364, pp. 409, 414.)

### II. *Applicable Authority*

#### A. *Attorney-Client Privilege*

The attorney-client privilege is codified in Evidence Code section 954, which provides in part: "[T]he client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer."

"[T]he fundamental purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote

full and open discussion of the facts and tactics surrounding individual legal matters. [Citation.] . . . [T]he public policy fostered by the privilege seeks to insure 'the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, [so] the former may have adequate advice and a proper defense.' [Citation.]" (*Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 599 [208 Cal.Rptr. 886, 691 P.2d 642] (*Mitchell*).)

"[T]he [attorney-client] privilege is absolute and disclosure may not be ordered, without regard to relevance, necessity or any particular circumstances peculiar to the case." (*Gordon v. Superior Court* (1997) 55 Cal.App.4th 1546, 1557 [65 Cal.Rptr.2d 53].) "Although exercise of the privilege may occasionally result in the suppression of relevant evidence, the Legislature of this state has determined that these concerns are outweighed by the importance of preserving confidentiality in the attorney-client relationship. . . . 'The privilege is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence.' [Citations.]" (*Mitchell, supra*, 37 Cal.3d at pp. 599–600.)

The privilege does not protect "independent facts related to a communication; that a communication took place, and the time, date and participants in the communication." (*State Farm Fire & Casualty Co. v. Superior Court* (1997) 54 Cal.App.4th 625, 640 [62 Cal.Rptr.2d 834].) Further, the privilege "does not protect disclosure of underlying facts which may be referenced within a qualifying communication" (*id.* at p. 639), and it does not extend to individuals who are no more than witnesses to the matter at issue in the litigation. (*Martin v. Workers' Comp. Appeals Bd.* (1997) 59 Cal.App.4th 333, 345 [69 Cal.Rptr.2d 138].) " 'Knowledge which is not otherwise privileged does not become so merely by being communicated to an attorney. . . . While the privilege fully covers communications as such, it does not extend to subject matter otherwise unprivileged merely because that subject matter has been communicated to the attorney.' " (*Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 397 [15 Cal.Rptr. 90, 364 P.2d 266].) "[T]ransmission alone, even where the parties intend the matter to be confidential, cannot create the privilege if none, in fact, exists." (*Suezaki v. Superior Court* (1962) 58 Cal.2d 166, 176 [23 Cal.Rptr. 368, 373 P.2d 432].) Documents that are independently prepared by a party "do not become privileged communications . . . merely because they are turned over to counsel." (*Wellpoint Health Networks, Inc. v. Superior Court* (1997) 59 Cal.App.4th 110, 119 [68 Cal.Rptr.2d 844] (*Wellpoint*).)

The attorney-client privilege only protects confidential communications between a client and his or her attorney during the course of an attorney-client relationship. In this regard, Evidence Code section 952 defines such a

confidential communication as "information transmitted between a client and his lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and advice given by the lawyer in the course of that relationship."

B. *Attorney Work Product Privilege*

The work product doctrine was recognized in *Hickman v. Taylor* (1947) 329 U.S. 495 [91 L.Ed. 451, 67 S.Ct. 385], which established a qualified privilege for certain materials prepared by an attorney acting for his client in anticipation of litigation: "Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case as the 'work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served." (*Id.* at pp. 510–511.)

An attorney's work product has been described as " 'the product of [the attorney's] effort, research, and thought in the preparation of his client's case. It includes the results of his own work, and the work of those employed by him or for him by his client, in investigating both the favorable and unfavorable aspects of the case, the information thus assembled, and the legal theories and plan of strategy developed by the attorney all as reflected in interviews, statements, memoranda, correspondence, briefs, and any other writings reflecting the attorney's "impressions, conclusions, opinions, or legal

research or theories," and in countless other tangible and intangible ways.' " (*BP Alaska Exploration, Inc. v. Superior Court* (1988) 199 Cal.App.3d 1240, 1253–1254, fn. 4 [245 Cal.Rptr. 682], italics omitted.)

The attorney work product rule reflects "the policy of the state to: (1) preserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases; and (2) to prevent attorneys from taking undue advantage of their adversary's industry and efforts." (Code Civ. Proc., § 2018, subd. (a).) The doctrine protects the " 'mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case.' " (*Hobbs v. Municipal Court* (1991) 233 Cal.App.3d 670, 692 [284 Cal.Rptr. 655].)

■ Code of Civil Procedure section 2018, subdivision (c) absolutely bars the use of statutory discovery procedures to obtain an attorney's "core" work product, defined as "[a]ny writing reflecting an attorney's impressions, conclusions, opinions, or legal research or theories." (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 381–382 & fn. 19 [285 Cal.Rptr. 231, 815 P.2d 304].) By contrast, there is only a conditional or qualified protection for "general" work product, which bars discovery of other aspects of an attorney's work product unless denial of discovery would unfairly prejudice a party or result in an injustice. (Code Civ. Proc., § 2018, subd. (b); *State Farm Fire & Casualty Co. v. Superior Court, supra,* 54 Cal.App.4th at pp. 649–650; *BP Alaska Exploration, Inc. v. Superior Court, supra,* 199 Cal.App.3d at p. 1250.) The determination of good cause contemplates a balancing of the need for disclosure against the purpose served by the work product doctrine. (*National Steel Products Co. v. Superior Court* (1985) 164 Cal.App.3d 476, 490 [210 Cal.Rptr. 535].)

C. *The "Dominant Purpose" Test*

In certain instances it is difficult to determine if the attorney-client privilege (or work product privilege) attaches to a communication, particularly where there may be more than one purpose for that communication: " ' "Where it is clear that the communication has but a single purpose, there is little difficulty in concluding that the privilege should be applied or withheld accordingly. If it appears that the communication is to serve a dual purpose, one for transmittal to an attorney 'in the course of professional employment' and one not related to that purpose, the question presented to the trial court is as to *which purpose predominates* . . . ." ' [Citation.]" (*Travelers Ins. Companies v. Superior Court* (1983) 143 Cal.App.3d 436, 452 [191 Cal.Rptr. 871], italics added.) This "dominant purpose" test not only looks to the dominant purpose for the communication, but also to the

dominant purpose of the attorney's *work*. (*Aetna Casualty & Surety Co. v. Superior Court* (1984) 153 Cal.App.3d 467, 475 [200 Cal.Rptr. 471] (*Aetna*); *Wellpoint, supra,* 59 Cal.App.4th at pp. 121–122.) Thus, "the attorney-client privilege [would] not apply without qualification where the attorney was merely acting as a negotiator for the client [citation], or merely gave business advice [citation], or was merely acting as a trustee for the client [citation]." (*Aetna, supra,* 153 Cal.App.3d at p. 475.)

For example, in *Montebello Rose Co. v. Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1 [173 Cal.Rptr. 856] (*Montebello Rose*), an attorney was hired by management to negotiate with a union. In an unfair labor practices proceeding before the Agricultural Labor Relations Board, the board reviewed, in camera, communications between the attorney and management. (*Id.* at p. 31.) Utilizing the dominant purpose test, the board concluded that those documents related to his role as labor negotiator were not privileged, separated them from documents related to legal advice, and allowed them into evidence. (*Id.* at pp. 31–32.) In doing so, the board noted that to give attorney-client protection to the attorney's negotiation communications "would unfairly reward those organizations able to hire attorneys as their negotiators because their communications concerning pending negotiations would be protected, whereas the communications of organizations with lay negotiators would not receive protection." (*Id.* at p. 32.) The Court of Appeal upheld the board's decision, reasoning that "[s]ince [management's] labor negotiations could have been conducted by a nonattorney, it is self-evident that communications with [the attorney] relating to the conduct of those negotiations were not privileged unless the dominant purpose of the particular communication was to secure or render legal service or advice." (*Ibid.*)

In *Watt Industries, Inc. v. Superior Court* (1981) 115 Cal.App.3d 802 [171 Cal.Rptr. 503] (*Watt*), the Court of Appeal held an attorney's notes were not protected by the attorney work product rule where counsel merely acted as business agent for his client. There, the attorney conveyed to plaintiff seller the clients' intention to reside in a condominium they were purchasing from plaintiff. At a deposition in an action filed by the seller the attorney refused to produce notes of that conversation with the seller. (*Id.* at p. 804, [171 Cal.Rptr. 503].) The Court of Appeal directed the superior court to compel production. The court noted the work product rule applied to documents related to legal work performed for a client and not to notes memorializing acts performed as a mere agent. In doing so, the Court of Appeal noted that "[t]o apply the privilege in such a situation would have the effect of placing a premium upon use of attorneys as business agents, nonattorneys or clients acting for themselves having no such right to protect their notes." (*Id.* at p. 805.)

In *Wellpoint, supra,* 59 Cal.App.4th 110, a discrimination action was brought by a terminated employee. In defense of the action, the employer asserted that it had hired an attorney to conduct a prelitigation investigation of the discrimination claims as soon as the employee alerted it. (*Id.* at p. 117.) After the employee initiated a lawsuit against the employer, the employee served a subpoena on the employer's attorney demanding production of all documents pertaining to the attorney's prelitigation investigation. The employer and its attorney refused production, citing the attorney-client privilege and the work product doctrine. Thereafter, the trial court issued a blanket ruling that the attorney-client privilege and the attorney work product doctrine did not apply, requiring production of all the documents demanded. (*Id.* at pp. 114–119.) In doing so, the trial court found that the attorney was operating in a "nonattorney capacity" in conducting the investigation. (*Id.* at p. 119.)

The employer filed a petition for writ of mandate. (*Wellpoint, supra,* 59 Cal.App.4th at p. 119.) In response to the petition the employee again asserted that the attorney-client and attorney work product privileges were inapplicable because "an attorney retained to investigate employee claims of discrimination is not acting as an attorney but as a fact finder . . . ." (*Id.* at p. 121.) The Court of Appeal agreed in principle with the employee, but nevertheless granted the employer's petition because the trial court had ordered blanket production instead of reviewing the documents individually to determine which were not privileged. The Court of Appeal rejected the idea that the *Montebello Rose* and *Watt* decisions supported such a blanket exception to the attorney-client privilege: "Reliance on these cases to support a blanket rule excluding attorney investigations of employer discrimination from attorney-client and work product protection is misplaced. Both cases involved analyses of individual documents containing attorney-client communications or purported work product to determine whether the dominant purpose behind each was or was not the furtherance of the attorney-client relationship. The courts in both cases recognized that even though an attorney is hired to conduct business affairs, he or she may be called on to give legal advice during the course of the representation, and documents related to those communications should be protected notwithstanding the original purpose of employing the attorney. The trial court . . . should have based its ruling on the subject matter of each document." (*Id.* at p. 122.)

In *Chicago Title Ins. Co. v. Superior Court* (1985) 174 Cal.App.3d 1142 [220 Cal.Rptr. 507] (*Chicago Title*), the plaintiff Chicago Title brought an action for fraud involving alleged "check kiting." The plaintiff alleged the defendant bank knew of the scheme but did nothing to stop it and in fact assisted the fraud. (*Id.* at pp. 1145–1147.) The bank, on the other hand, claimed that Chicago Title not only knew of the fraudulent scheme, but itself was a willing participant. (*Id.* at p. 1147.) During discovery, the bank deposed

Chicago Title's in-house counsel. It sought to ask him about conversations he had with other Chicago Title employees. Chicago Title objected on the ground of attorney-client privilege and instructed him not to answer. (*Id.* at p. 1148.) On a motion to compel, the trial court found that the attorney-client privilege had been waived because the questions concerned the state of Chicago Title's knowledge of the fraud. (*Ibid.*) The Court of Appeal denied Chicago Title's petition for writ of mandate seeking to set aside the trial court's discovery order. In doing so, the court first noted that the in-house counsel "performed functions which are not typically those of either outside counsel or house corporate counsel. For instance, [Chicago Title attorneys] were involved with quality control of escrow accounts. As part of this procedure [in-house counsel] monitored the checks coming into and disbursed from the accounts. It is settled that the attorney-client privilege is inapplicable where the attorney merely acts as a negotiator for the client, gives business advice or otherwise acts as a business agent." (*Id.* at p. 1151.) In finding that the assertion of the attorney-client privilege was inappropriate in that case, the Court of Appeal held that in-house counsel's actions as an attorney for Chicago Title "were so intertwined with activities which were wholly business or commercial that a clean distinction between the two roles became impossible to make. This merging of business and legal activities jeopardizes the assertion of the attorney-client privilege, since the attorney and the client in effect have become indistinguishable." (*Id.* at p. 1154.)

*Aetna, supra,* 153 Cal.App.3d 467, a case relied upon by Chicago Title on this appeal, also discussed the dominant purpose test. There, the plaintiff owned a home that was destroyed in a mudslide. The homeowner filed a claim with his insurer under a homeowner's policy. The insurer retained outside counsel to investigate the homeowner's claim and make a coverage determination under the policy. (*Id.* at pp. 470, 476.) The insurance company filed a declaratory relief action seeking a determination that the claim was not covered and the homeowner responded with an action claiming bad faith denial of insurance coverage. (*Id.* at pp. 470–471.)

During that litigation, the homeowner sought production of outside counsel's files regarding their investigation of the homeowner's claim and sought the depositions of outside counsel involved in that investigation. (*Aetna, supra,* 153 Cal.App.3d at p. 471.) The insurer objected to the depositions and production of much of outside counsel's files on the basis of the attorney-client and attorney work product privileges and brought a motion to quash the subpoenas or for a protective order. (*Ibid.*) The trial court rejected Aetna's objections, allowing the discovery to proceed, and Aetna brought a petition for writ of mandate to overturn the trial court's decision. (*Ibid.*)

The Court of Appeal rejected the homeowner's argument that the attorney-client and attorney work product privileges did not apply because Aetna's

outside counsel "was hired to act as some form of outside claims adjuster, rather than to render legal advice." (*Aetna, supra,* 153 Cal.App.3d at p. 475.) In doing so, the Court of Appeal distinguished *Montebello, Watt* and other cases on the basis that in those cases "the client's dominant purpose in retaining the attorney was something other than the request for a legal opinion or advice. However, as [the homeowner] states in his own brief, in the case before us 'Aetna retained [the attorney] to investigate [the homeowner's] claim and make a coverage determination under the policy.' This is a classic example of a client seeking legal advice from an attorney. The attorney was given a legal document (the insurance policy) and was asked to interpret the policy and to investigate the events that resulted in damage to determine whether Aetna was legally bound to provide coverage for such damage." (*Aetna,* at pp. 475–476.)

The Court of Appeal went on to temper this conclusion, however, stating that "even assuming that Aetna retained [the attorneys] for a purpose other than the rendition of legal advice, this does not mean ipso facto that all communications between Aetna and [the attorney] would not be protected by the attorney-client privilege." (*Aetna, supra,* 153 Cal.App.3d at p. 476.) Relying on *Montebello, supra,* 119 Cal.App.3d 1, the Court of Appeal stated that the trial court's error was in granting the homeowner blanket access to outside counsel's files and testimony instead of conducting an in camera review to determine which items were privileged and which were not: "In the instant case it appears that the judge did not conduct an *in camera* examination of the written or verbal communications which [the homeowner] seeks to discover. Instead, despite Aetna's prima facie showing via declarations that at least some of the communications were privileged, the judge, without inspecting those communications, refused to issue an order limiting [the homeowner's] access to [the attorney's] files or the testimony of the attorneys." (*Aetna, supra,* 153 Cal.App.3d at p. 476, fn. omitted.)

One treatise has interpreted these cases as holding that the attorney-client and attorney work product privileges may not be available where attorneys are "hired *solely* to investigate or adjust a claim, or to negotiate a contract, rather than to provide legal advice." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2003) ¶ 8:217.2, p. 8C-57.) The treatise goes on to conclude, citing *Aetna* and *Wellpoint,* that "[w]here an attorney is hired *both to investigate and to advise* the client, the court may have to review the attorney's files *in camera* to determine which documents reflect investigative work and which reflect the rendering of legal advice." (*Id.* at p. 8C-58.) Moreover, the treatise advises that "[t]his can be a particular problem for *in-house legal counsel* who are often asked to 'investigate' or 'handle' a matter without knowing whether legal advice is required. [¶] If sensitive information is likely to be encountered, it may be a good idea to consider hiring *outside* counsel to do the investigation. That way, in-house

counsel will be free to maintain *separate* files, and can evaluate the case and advise the client without fear that those files will be discoverable by the opposing party." (*Id.* at [¶] 8:217.3, p. 8C-58.)

### D. *Waiver by Placing Subject Matter at Issue*

The attorney-client or attorney work product privilege may be impliedly waived by placing the contents of the privileged communications at issue in the case. (*Mitchell, supra,* 37 Cal.3d at p. 604; *Wellpoint, supra,* 59 Cal.App.4th at p. 129.) "Where privileged information goes to the heart of the claim, fundamental fairness requires that it be disclosed for the litigation to proceed." (*Steiny & Co. v. California Electric Supply Co.* (2000) 79 Cal.App.4th 285, 292 [93 Cal.Rptr.2d 920].) The scope of an implied waiver must be "narrowly defined and the information required to be disclosed must fit strictly within the confines of the waiver." (*Transamerica Title Ins. Co. v. Superior Court* (1987) 188 Cal.App.3d 1047, 1052 [233 Cal.Rptr. 825].) The party opposing the privilege bears the burden of showing that there has been an implied waiver. (Evid. Code, § 917;[4] *Wellpoint, supra,* 59 Cal.App.4th at p. 124.)

The court in *Merritt v. Superior Court* (1970) 9 Cal.App.3d 721 [88 Cal.Rptr. 337] was the first in California to recognize the theory of an implied waiver of the privilege under the common law. The apparent rationale for this implied nonstatutory waiver has been explained as follows: " '[T]he Evidence Code does *not* create any exception to the lawyer-client privilege for the situation in which a client *tenders* an issue such as his lawyer's conduct or state of mind. But the Code does *not* bar the courts from creating by decisional law *new* exceptions to various privileges.' " (*Chicago Title, supra,* 174 Cal.App.3d at p. 1149, fn. 8, quoting 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 40: 3, p. 1467, original italics.) Applying this reasoning, the court in *Merritt* held that the plaintiff had impliedly waived the attorney-client privilege since he had specifically put the state of mind of his attorney at issue by alleging that the defendant's attorney had confused his attorney and impeded his attorney's ability to settle his claim. (*Merritt v. Superior Court, supra,* 9 Cal.App.3d at p. 730.) ▆ The California Supreme Court recognized this theory of an implied waiver in *Mitchell, supra,* 37 Cal.3d 591, and established that the person or entity seeking to discover privileged information can show waiver by demonstrating that the client has put the otherwise privileged communication directly at issue and

---

[4] Evidence Code section 917 provides in part: "Whenever a privilege is claimed on the ground that the matter sought to be disclosed is a communication made in confidence in the course of the lawyer-client . . . relationship, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential."

that disclosure is essential for a fair adjudication of the action. (*Id.* at p. 609 [holding that under the facts of that case no implied waiver occurred].)

The doctrine of implied waiver was illustrated in *Wellpoint, supra,* 59 Cal.App.4th 110 (discussed, *ante*), where the Court of Appeal held that the employer would waive the attorney-client privilege to the extent it relied upon the attorney's investigation as a defense to the employee's claims. (*Id.* at pp. 125–129.) As the court stated there: "If a defendant employer hopes to prevail by showing that it investigated an employee's complaint and took action appropriate to the findings of the investigation, then it will have to put the adequacy of the investigation directly at issue, and cannot stand on the attorney-client privilege or work product doctrine to preclude a thorough examination of its adequacy. The defendant cannot have it both ways. If it chooses this course, it does so with the understanding that the attorney-client privilege and the work product doctrine are thereby waived." (*Id.* at p. 128.) The Court of Appeal nevertheless issued the employer's writ of mandate to overturn the trial court's discovery order as the trial court never reached the question of waiver and, because the pleadings were not final based upon a successful demurrer, it was unclear whether the employer would continue to maintain its proper investigation defense. (*Id.* at pp. 128–130.)

E. *Discovery of Claims Files in Insurance "Bad Faith" Actions*

The importance of claims files as evidence in insurance bad faith actions has long been emphasized: "In bad faith cases, the jury is entitled to know exactly what information was in the insurer's claims file (aside from privileged information): 'How else could they have properly determined whether [the insurer] acted fairly and in good faith in its handling of the claim?' " (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2003) ¶ 15:737, p. 15-127, quoting *Richardson v. Employers Liab. Assur. Corp.* (1972) 25 Cal.App.3d 232, 242 [102 Cal.Rptr. 547], overruled on other grounds in *Gruenberg. v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 580–581, fn. 10 [108 Cal.Rptr. 480, 510 P.2d 1032].) "The claims file is a unique, contemporaneously prepared history of the company's handling of the claim; in an action [for bad faith] the need for the information in the file is not only substantial but overwhelming." (*Reavis v. Metropolitan Property & Liability Ins. Co.* (S.D.Cal. 1987) 117 F.R.D. 160, 164.)

The importance of claims files is underscored by regulations promulgated by the California Insurance Commissioner that require all insurance companies investigate each filed claim, and maintain claims files containing all documents, notes and work papers pertaining to each claim. (Cal. Code Regs., tit. 10, §§ 2695.5, subd. (e)(3) & 2695.3 subds. (a) & (b).)[5]

[5]California Code of Regulations, title 10, section 2695.5, subdivision (e)(3) provides: "(e) Upon receiving notice of claim, every insurer shall immediately, but in no event more than

However, not everything in the insurer's claims file is discoverable. Upon timely objection or motion for protective order, *privileged information* (e.g., attorney-client communications or attorney work product) is protected from discovery. Application of the privilege must generally be determined by the court on a document-by-document and issue-by-issue basis. (See *Meritplan Insurance Co. v. Superior Court* (1981) 124 Cal.App.3d 237, 242 [177 Cal.Rptr. 236].)

## III. ANALYSIS

### A. Attorney-Client Privilege

In this insurance bad faith action we are presented with the issue of what, if any, claims investigation material is protected by the attorney-client or attorney work product privileges where the in-house claims adjusters also happen to be licensed attorneys. In answering this question we must balance 2,022 Ranch's need for discovery of claims investigation materials with Chicago Title's rights to protect attorney-client and attorney work product protected information. We decline to accept either 2,022 Ranch's position that all material or communications developed by the in-house attorney adjusters in conducting the investigation of 2,022 Ranch's claim are open to discovery, or Chicago Title's position that all of the withheld material is privileged. Rather, we conclude that evidence reflecting the factual investigation of 2,022 Ranch's claim is subject to discovery. Only those communications reflecting the requesting of, or rendering of, legal advice are protected by the attorney-client privilege, and only the attorney's legal impressions, conclusions, opinions, or legal research or theories are subject to the attorney work product privilege. ■ As the court did not engage in an analysis of each deposition question or document request utilizing the correct standard to determine what was the dominant purpose of those communications, we grant 2,022 Ranch's petition and remand this matter for further proceedings consistent with this opinion.

■ In reaching this conclusion, we first observe that the claims adjuster primarily responsible for 2,022 Ranch's claim admitted that her position at Chicago Title for the most part was that of a claims adjuster: investigating the

fifteen (15) calendar days later, do the following unless the notice of claim received is a notice of legal action: [¶] ... [¶] (3) begin any necessary investigation of the claim." California Code of Regulations, title 10, section 2695.3, subdivision (a) provides: "Every licensee's claim files shall be subject to examination by the Commissioner or by his or her duly appointed designees. These files shall contain all documents, notes and work papers (including copies of all correspondence) which reasonably pertain to each claim in such detail that pertinent events and the dates of the events can be reconstructed and the licensee's actions pertaining to the claim can be determined."

claims, analyzing them, and determining whether payment should be made.[6] This is work that in the insurance industry ordinarily could be done by an individual not licensed to practice law. Cloaking such an adjuster's factual investigation in privilege would shield from discovery information that otherwise would not be entitled to any protection if communicated by an adjuster who was not an attorney but performed the same duties. "To apply the privilege in such a situation would have the effect of placing a premium upon use of attorneys as [adjusters], nonattorneys or clients acting for themselves having no such right to protect their" communications.. (*Watt, supra,* 115 Cal.App.3d at p. 805.)

██ We also recognize what Chicago Title claims is the unique and complicated nature of title insurance, requiring, according to Chicago Title, the hiring of attorneys to perform claims handling roles. Chicago Title claims that its relies on their "legal expertise and training, and their ability to interpret title policies, determine coverage, as well as to assess and provide legal advice as to coverage issues."[7] However, this entitles to protection only those communications that constitute the actual rendering of, or request for, legal advice, not those communications reflecting the adjusters' factual investigation of 2,022 Ranch's claim.

· Chicago Title points to *Aetna, supra,* 153 Cal.App.3d 467 in support of its claim that an in-house attorney's investigation of an insured's claim and determination of coverage itself constitutes the provision of legal advice. This argument is unpersuasive. First, in *Aetna,* the insurance company retained *outside* counsel to determine coverage, it did not utilize in-house claims adjusters whose role on a day-to-day basis is to investigate claims. ██ The hiring of outside counsel for a specific project usually indicates that a client is seeking legal advice. However, as discussed above, employing attorneys to conduct routine claims investigations does not make their factual investigations subject to the attorney-client privilege.

We also do not interpret the holding of *Aetna* so broadly. Despite the sweeping statement made by the Court of Appeal there (*Aetna, supra,* 153

---

[6] Regulations promulgated by the California Insurance Commissioner define a "claims agent" as "any person employed or authorized by an insurer, to conduct an investigation of a claim on behalf of an insurer . . . ." (Cal. Code Regs., tit. 10, § 2695.2, subd. (d).) An investigation includes "all activities of an insurer or its claims agent related to the determination of coverage, liabilities, or nature and extent of loss or damage for which benefits are afforded by an insurance policy . . . ." (Cal. Code Regs., tit. 10, § 2695.2, subd. (k).)

[7] We granted leave to the California Land Title Association (the CLTA) to file an amicus curiae brief on behalf of Chicago Title. In that brief, the CLTA makes statements concerning the title insurance industry, the nature and uniqueness of its claims adjusting practices, and the reasons why the work of its attorney claims adjusters should be protected by the attorney-client privilege. 2,022 Ranch has objected to these portions of the CLTA's brief on the ground that they are not supported by any record. In this opinion we do not rely upon any factual statements contained in the CLTA's brief that are not supported by a citation to the record.

Cal.App.3d at pp. 475–476), in its holding it remanded the matter to the trial court to conduct a particularized review of the communications to determine which were protected and which were not. Indeed, as noted above, at least one treatise has reconciled the *Aetna* decision with other California authority to mean that factual claims investigations are not protected. The only matters that are protected are those communications that constitute the actual requesting or rendering of legal advice. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra,* ¶ 8:217.2, p. 8C-58 ["Where an attorney is hired *both to investigate and to advise* the client, the court may have to review the attorney's files *in camera* to determine which documents reflect investigative work and which reflect the rendering of legal advice"].) To the extent that *Aetna* can be read so broadly as to hold that any factual claims investigation work by an in-house attorney claims adjuster is privileged, we decline to follow that decision as contrary to California law. (*Montebello Rose, supra,* 119 Cal.App.3d at p. 32; *Watt, supra,* 115 Cal.App.3d at p. 805; *Wellpoint, supra,* 59 Cal.App.4th at pp. 121–122; *Chicago Title, supra,* 174 Cal.App.3d at pp. 1151, 1154.)

Further, although we are resolving this appeal based upon California law, out-of-state authority and secondary authority also support our holding. In *National Farmers Union Property & Casualty Co. v. District Court* (Colo. 1986) 718 P.2d 1044, 1047–1048, the Colorado Supreme Court held that a memorandum prepared by outside counsel to inform an insurer's general counsel of results of a claims investigation, which included interviews with employees of the insured, was not protected by the attorney work product privilege. In reaching this conclusion, the Colorado high court stated that the insurer could not "avail itself of the protection afforded by the work product doctrine simply because it hired attorneys to perform the factual investigation into whether the claim should be paid. The attorneys were performing the same function a claims adjuster would perform, and the resulting report is an ordinary business record of the insurance company." (*Id.* at p. 1048.) In *Mission Nat. Ins. Co. v. Lilly* (D.Minn. 1986) 112 F.R.D. 160, 163–165, the District Court held that to the extent that a law firm employed by an insurer acted as a claims adjuster, work product, communications to client, and impressions about facts were to be treated as ordinary business of the insurer; and those sections of documents reflecting mental processes and opinions of counsel which truly bore on anticipated litigation would be redacted as protected. In Medaglia et al., *Privilege, Work Product, and Discovery Issues in Bad Faith Litigation* (Fall 1996) 32 Tort & Ins. L.J. 1, 7, the author observed that "[a] number of courts have viewed the hiring of an attorney to serve the dual role of counsel and claims investigators as an attempt to obstruct discovery into claims handling and investigation. When the communication is divisible into a purely factual, or nonlegal, component and a legal one, courts will generally require disclosure of the factual component." (Fns. omitted.) In Fischer, *The Attorney-Client/Work Product Privileges and Surety*

*Investigative Information: Applying Old Rules to New Tricks* (Summer 1999) 34 Tort & Ins. L.J. 1009, 1030, the author stated, "Insofar as sureties employ attorneys, whether in-house or as outside counsel, to perform ordinary business functions, no privilege attaches. Thus, the attorney-client privilege does not apply where an attorney is retained primarily to investigate facts, but only where the attorney is rendering legal services and advice." (Fns. omitted.)

Chicago Title also argues that in fact it has already produced all nonprivileged information from its claims files, and that the remaining items under dispute constituted privileged attorney-client communications or attorney work product. This argument is unavailing.

■ A brief review of the deposition questions at issue here demonstrates that at least some of the requested information concerned Chicago Title's factual claims investigation, not the rendering of legal advice. For example, Chicago Title objected to questions to the adjuster Look concerning her interviews with third parties (the escrow company and the seller's agent) as part of her investigation. These questions concerned her factual claims investigation and do not constitute attorney-client communications or attorney work product.[8] Similarly, our in camera review of the withheld documents reveals that at least some of them contain information concerning factual claims investigation, and, subject to some possible redaction to omit items reflecting attorneys' legal impressions, conclusions, etc., they do not appear to be protected.[9] ■ We decline, however, to engage in fact finding on this appeal and go through each question or document and make a determination which should be the subject of discovery and which withheld on grounds of privilege. That is the role of the trial court, which we direct, upon remand, to make a determination of this issue consistent with this opinion.

The inquiry here is also made more complicated by the posture of this case. Chicago Title has admitted bad faith, i.e., that it unreasonably delayed the acceptance of 2,022 Ranch's claim. However, the amount of damages to be paid and, more importantly, the claim for punitive damages remain at issue. ■ Resolution of the punitive damages issue depends upon whether Chicago Title's bad faith in handling 2,022 Ranch's claim was also malicious, fraudulent or oppressive. To the extent that Chicago Title defends against this claim based upon the state of mind of its claims investigators and intends to call them as witnesses at trial to defend its actions, the attorney-client and attorney work product privileges may be waived. (*Wellpoint, supra,*

---

[8] At oral argument, counsel for Chicago Title conceded that these questions did not impinge upon the attorney-client or attorney work product privileges.

[9] We requested that Chicago Title produce to this court, under seal, the documents withheld under privilege and have reviewed them as part of the record on appeal.

59 Cal.App.4th at p. 128.) Chicago Title cannot assert the attorney-client and work product privileges to thwart discovery concerning their investigators' work on the claim and at the same time rely upon their testimony and state of mind in conducting the investigation to defend against the claim for punitive damages. This issue must be resolved preliminarily upon further proceedings in this matter following remand.

B. *Attorney Work Product Privilege*

Chicago Title argues that the court's ruling was correct because the attorney work product privilege also protected the information sought. However, as discussed, *ante*, to the extent that the claims adjusters were performing claims investigations and the information constituted factual matters concerning that investigation, the work product privilege would not apply, as the attorneys were working as claims adjusters, not legal advisors. Further, there is no indication that the court examined each of the documents and deposition questions to determine if the work product privilege applied, and as to what particular information. Additionally, the court has not resolved whether any of the materials could be considered "core" attorney work product subject to an absolute privilege (i.e., any writings reflecting an attorney's legal impressions, conclusions, opinions, or legal research or theories), nor, as discussed above, whether this privilege is waived by virtue of Chicago Title's defense of this matter. Further, even if some of the information constitutes non-"core" work product, the court must still determine whether 2,022 Ranch's need for discovery of that information would make application of this privilege unfairly prejudicial to its claim or result in an injustice. (Code Civ. Proc., § 2018, subd. (b).) On remand, the court will have to determine, consistent with this opinion, the application and scope of the attorney work product privilege to the requested information.

DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its order of April 18, 2003, denying 2,022 Ranch's motion to compel a response to deposition questions and production of documents. The court is ordered to conduct a particularized review of the deposition questions and documents at issue to determine which are protected by the attorney-client privilege and/or work product privileges, consistent with the conclusions expressed in this opinion. Petitioner shall recover its costs on this writ proceeding.

McDonald, J., and O'Rourke, J., concurred.

A petition for a rehearing was denied January 5, 2004, and the opinion was modified to read as printed above.